# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 25, 2008

Charles R. Fulbruge III
Clerk

No. 07-30470

In Re: In the Matter of: SOUTHERN SCRAP MATERIAL COMPANY LLC,

As owner of the Southern Scrap Drydock, in a cause of Exoneration from, or

Limitation of Liability

-------------------------------------------------------------------------------------------------------

SOUTHERN SCRAP MATERIAL COMPANY LLC, as owner of the Southern

Scrap Drydock

Petitioner-Appellant

v.

ABC INSURANCE COMPANY

Respondent

UNITED STATES OF AMERICA

Claimant-Appellee

Appeal from the United States District Court
for the Eastern District of Louisiana

Before WIENER, BARKSDALE, and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:

In this interlocutory appeal filed pursuant to 28 U.S.C. § 1292(a)(1),

Southern Scrap Material Co., L.L.C. ("Southern Scrap"), contends that the

district court erred by entering an order partially lifting and/or modifying the injunction it had previously issued in this limitation of liability action to allow the United States of America (the "United States") to pursue a claim against Southern Scrap outside of the context of the Limitation of Liability Act of 1851 (the "Limitation Act"), 46 App. U.S.C. § 183, revised at 46 U.S.C. § 30505 et seq. The United States' claim against Southern Scrap is brought pursuant to the Wreck Act, which is part of the Rivers and Harbors Act of 1899.[1] The United States seeks to hold Southern Scrap personally liable for the full amount of the wreck removal expenses it incurred when it removed Southern Scrap's sunken drydock from the Inner Harbor Navigational Canal (the "Industrial Canal") in New Orleans, Louisiana, after Hurricane Katrina; the cost of this removal far exceeded the post-accident value of the wrecked drydock. The United States asserted during the limitation proceeding that it should be allowed to file its claim as a civil action against Southern Scrap outside of the limitation proceeding because the Limitation Act does not apply to claims brought by the United States under the Wreck Act. Southern Scrap opposed the United States' motion to lift or modify the injunction in the district court, arguing that the Wreck Act does not authorize a statutory action to hold Southern Scrap, as the non-negligent owner of the drydock, personally liable for wreck-removal expenses, and even if it does, Southern Scrap's liability under the Wreck Act is limited by the Limitation Act to the drydock's post-accident value.

The questions presented in this appeal are therefore twofold: (1) whether the United States' claim under the Wreck Act states a claim upon which relief can be granted; and if so, (2) whether the Limitation Act applies so as to limit

---

[1] Sections 15, 16, 19 and 20 of the Rivers and Harbors Act of 1899 (33 U.S.C. §§ 409, 411, 412, 414 and 415) are collectively known as the Wreck Act. See Nunley v. M/V DAUNTLESS COLOCOTRONIS, 727 F.2d 455, 457 n.1 (5th Cir. 1984) (en banc).

the United States' recovery on its Wreck Act claim.  Viewing the facts alleged in the light most favorable to the United States, as we must at this pleading stage, we conclude that, as a result of the 1986 amendments to the Wreck Act, the United States may bring a statutory action under the Wreck Act to hold Southern Scrap personally liable for the cost of removing its sunken drydock, and that the claim is not subject to the Limitation Act.  We therefore AFFIRM the district court's judgment insofar as it is consistent with this opinion.  In so holding, we intimate no view as to the ultimate merits of the United States' claim or the defenses or counterclaims that may be asserted by Southern Scrap against it.

## I.  FACTUAL BACKGROUND

The following facts are taken from the allegations of fact contained in the claim filed by the United States in the limitation proceeding.  When Hurricane Katrina struck New Orleans, Louisiana, on August 29, 2005, Southern Scrap was the owner and/or operator of a buoyant drydock located at its facility on the Industrial Canal inside the city.  Katrina's surge caused the drydock to break free from its moorings and partially sink in the Industrial Canal against the Florida Avenue Bridge fender system.[2]  The United States Army Corps of Engineers (the "Corps") considered the sunken drydock to be a hazard to navigation in the heavily-used Industrial Canal, which it considers to be part of the navigable waters of the United States, and, accordingly, determined that it should be removed in order to eliminate the hazard.  On September 9, 2005, the Corps allegedly contacted Southern Scrap and advised it that the drydock was a hazard that needed to be removed.  The Corps contends that Southern Scrap

---

[2] According to Southern Scrap's limitation complaint, the drydock measured 220 feet long by 157 feet wide by 24 feet deep and displaced 3,868 long tons.

responded that it did not have the resources to remove the drydock in a timely manner but that it would provide blueprints to facilitate the drydock's removal. The Corps then hired Boh Bros. Construction Co. ("Boh Bros.") to remove the drydock from the Industrial Canal, and operations commenced on September 18, 2005. Boh Bros. completed removal of the drydock on December 2, 2005.[3] Thereafter, pursuant to 33 U.S.C. § 409, the Corps demanded payment for its removal costs, which it estimated to be about $8,000,000, from Southern Scrap, as the owner and/or operator of the drydock that impeded navigation in the Industrial Canal. To date, Southern Scrap has refused to pay the amount requested by the United States for the cost of removing the drydock from the Industrial Canal.

## II. PROCEDURAL BACKGROUND

On April 11, 2006, Southern Scrap filed a petition for limitation of liability in the Eastern District of Louisiana pursuant to the Limitation Act, by which it sought to limit its liability to the post-accident value of the drydock, which it stipulated to be $316,131.64. That same day, in accordance with the Limitation Act, the district court issued an order restraining the filing, commencement, and further prosecution of any legal proceedings against Southern Scrap arising out of the sinking of its drydock outside of the limitation action. The district court's order also required any party with a claim against Southern Scrap based on the damage or costs caused by the sunken drydock to file that claim as part of the

---

[3] During the pendency of removal operations, two tows struck the drydock while passing through the Industrial Canal. On October 16, 2005, Barge VL-81442, which was being towed by the M/V WENDY C, struck the drydock and sustained damage. On November 9, 2005, MMI 3019, a tank barge which was being towed by the M/V Bethesda, struck the drydock and sustained damage. The owners of both vessels have filed claims against Southern Scrap, but their claims are not relevant to the issues presently before the Court on this interlocutory appeal.

limitation action by July 14, 2006. Five parties did so, including the United States, which filed its claim pursuant to the Wreck Act.

On December 22, 2006, the United States filed a motion asking the district court to lift or modify its April 11, 2006 limitation order so that the United States could pursue its claim for the entirety of its wreck removal expenses under the Wreck Act against Southern Scrap outside of the context of the limitation proceeding. On April 26, 2007, the district court granted the United States' motion, thereby allowing it to bring an unlimited personal liability claim under the Wreck Act outside of the context of the limitation proceeding against Southern Scrap for the entirety of the wreck removal expenses. Southern Scrap then timely filed this interlocutory appeal pursuant to 28 U.S.C. § 1292(a)(1). See Complaint of Mucho K, Inc., 578 F.2d 1156, 1157 (5th Cir. 1978) (holding that the modification or dissolution of an injunction in a limitation of liability proceeding is appealable as a matter of right under § 1292(a)(1)).

III. STANDARD OF REVIEW

Because we must decide whether the United States is able to state a claim under the Wreck Act in order to resolve whether the district court properly granted the United States' motion to lift or modify the injunction in the limitation proceeding, we treat this matter as if it comes to us in the form of a denial of a Rule 12(b)(6) motion brought by Southern Scrap. We review a district court's determination of a Rule 12(b)(6) motion de novo. Abraham v. Singh, 480 F.3d 351, 354 (5th Cir. 2007). When reviewing a motion to dismiss, we must accept all well-pleaded facts as true and view them in the light most favorable to the non-moving party. Baker v. Putnal, 75 F.3d 190, 196 (5th Cir. 1996). As the Supreme Court recently emphasized, the "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful

in fact)" and the non-moving party must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965, 1974 (2007). This standard "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of" the necessary claims or elements. Id. at 1965.

Furthermore, this Court reviews a district court's statutory construction de novo. See Kaluom v. Stolt Offshore, Inc., 504 F.3d 511, 514 (5th Cir. 2007); see also Kemp v. G.D. Searle & Co., 103 F.3d 405, 407 (5th Cir. 1997) ("Questions of statutory interpretation are questions of law and thus reviewed de novo.").

## IV. DISCUSSION

### A. The United States has sufficiently alleged a claim against Southern Scrap upon which relief can be granted under the Wreck Act.

The Rivers and Harbors Act, "an assertion of the sovereign power of the United States" over its navigable waterways pursuant to Article I, § 8 of the Constitution, "was obviously intended to prevent obstructions in the Nation's waterways." Wyandotte Transp. Co. v. United States, 389 U.S. 191, 201 (1967). The Supreme Court has "consistently found [the Rivers and Harbors Act's] coverage to be broad," and it has "found that a principal beneficiary of the Act, if not the principal beneficiary, is the Government itself." Id. at 201. The Wreck Act, which is comprised of certain provisions of the Rivers and Harbors Act, viz., 33 U.S.C. §§ 409, 411, 412, 414 and 415, "addresses the problem of obstructions caused by sunken vessels." Univ. of Texas Med. Branch at Galveston v. United States, 557 F.2d 438, 444 (5th Cir. 1977). Its purpose is "the protection of other vessels plying the same waters" as the sunken vessels. United States v. Raven, 500 F.2d 728, 732 (5th Cir. 1974). "Congress sought to ensure that navigable waterways remained free of obstructions, including sunken vessels." Univ. of Texas Med. Branch at Galveston, 557 F.2d at 441. Three sections of the Wreck

Act are relevant to this case: 33 U.S.C. § 409; 33 U.S.C. § 414; and 33 U.S.C. § 415.

Section 409 specifically addresses the problem of obstructions to navigable waterways caused by sunken vessels.[4] The Supreme Court and this Court have construed § 409 as having three separately operative clauses.[5] The first clause prohibits the sinking, or permitting or causing the sinking, of vessels or other craft in navigable channels. The second clause provides that the owner, lessee, or operator of a vessel sunken in a navigable channel must mark it with a buoy or beacon by day and a light at night. The third clause provides that the owner, lessee, or operator of a vessel sunken in a navigable channel shall commence the immediate removal of the vessel and prosecute the removal diligently, or else be considered as having abandoned the vessel, subjecting it to removal by the United States as provided for in 33 U.S.C. §§ 414 and 415, inter alios.[6]

---

[4] Section 409, in pertinent part, provides:

> It shall not be lawful . . . to sink, or permit or cause to be sunk, vessels or other craft in navigable channels . . . . And whenever a vessel, raft or other craft is wrecked and sunk in a navigable channel, it shall be the duty of the owner, lessee, or operator of such sunken craft to immediately mark it with a buoy or beacon during the day and . . . a light at night, and to maintain such marks until the sunken craft is removed or abandoned, and the neglect or failure of the said owner, lessee, or operator so to do shall be unlawful; and it shall be the duty of the owner, lessee, or operator of such sunken craft to commence the immediate removal of the same, and prosecute such removal diligently, and failure to do so shall be considered as an abandonment of such craft, and subject the same to removal by the United States as provided for in sections 411 to 416, 418, and 502 of this title.

33 U.S.C. § 409.

[5] See Wyandotte, 389 U.S. at 206-07; Univ. of Texas Med. Branch at Galveston, 557 F.2d at 444; see also Nunley, 727 F.2d at 459; Tenn. Valley Sand & Gravel Co. v. M/V Delta, 598 F.2d 930, 934 (5th Cir. 1979).

[6] Prior to 1986, § 409 read:

7

Sections 414[7] and 415[8] expressly

---

> It shall not be lawful . . . to voluntarily or carelessly sink, or permit or cause to be sunk, vessels or other craft in navigable channels . . . . And whenever a vessel, raft or other craft is wrecked and sunk in a navigable channel, accidentally or otherwise, it shall be the duty of the owner of such sunken craft to immediately mark it with a buoy or beacon during the day and a lighted lantern at night, and to maintain such marks until the sunken craft is removed or abandoned, and the neglect or failure of the said owner so to do shall be unlawful; and it shall be the duty of the owner of such sunken craft to commence the immediate removal of the same, and prosecute such removal diligently, and failure to do so shall be considered as an abandonment of such craft, and subject the same to removal by the United States as provided for in sections 411-416, 418, and 502 of this title.

Wyandotte, 389 U.S. at 197 (quoting the pre-1986 version of 33 U.S.C. § 409).

Congress amended the Wreck Act in 1986. As part of those amendments, Congress removed the words "voluntarily or carelessly" from the first sentence of § 409, so that it now reads simply "or to sink, or permit or cause to be sunk." See Water Resources Development Act of 1986, H.R. 6, 99th Cong. § 939(a) (1986). Congress also omitted the words "accidentally or otherwise" from the second sentence of § 409, and inserted ", lessee, or operator" after each place "owner" appears in the statute. Id.

---

[7] The current version of § 414 reads in full:

> (a) Whenever the navigation of any river, lake, harbor, sound, bay, canal, or other navigable waters of the United States shall be obstructed or endangered by any sunken vessel, boat, water craft, raft, or other similar obstruction, and such obstruction has existed for a longer period than thirty days, or whenever the abandonment of such obstruction can be legally established in a less space of time, the sunken vessel, boat, water craft, raft, or other obstruction shall be subject to be broken up, removed, sold, or otherwise disposed of by the Secretary of the Army at his discretion, without liability for any damage to the owners of the same: Provided, That in his discretion, the Secretary of the Army may cause reasonable notice of such obstruction of not less than thirty days, unless the legal abandonment of the obstruction can be established in a less time, to be given by publication, addressed "To whom it may concern," in a newspaper published nearest to the locality of the obstruction, requiring the removal thereof: And provided also, That the Secretary of the Army may, in his discretion, at or after the time of giving such notice, cause sealed proposals to be solicited by public advertisement, giving reasonable notice of not less than ten days, for the removal of such obstruction as soon as possible after the expiration of the

above specified thirty days' notice, in case it has not in the meantime been so removed, these proposals and contracts, at his discretion, to be conditioned that such vessel, boat, water craft, raft, or other obstruction, and all cargo and property contained therein, shall become the property of the contractor, and the contract shall be awarded to the bidder making the proposition most advantageous to the United States: Provided, That such bidder shall give satisfactory security to execute the work: Provided further, That any money received from the sale of any such wreck, or from any contractor for the removal of wrecks, under this paragraph shall be covered into the Treasury of the United States.

(b) The owner, lessee, or operator of such vessel, boat, watercraft, raft, or other obstruction as described in this section shall be liable to the United States for the cost of removal or destruction and disposal as described which exceeds the costs recovered under subsection (a) of this section. Any amount recovered from the owner, lessee, or operator of such vessel pursuant to this subsection to recover costs in excess of the proceeds from the sale or disposition of such vessel shall be deposited in the general fund of the Treasury of the United States.

[8] The current version of § 415 reads, in pertinent part:

(a) Removal authority. Under emergency, in the case of any vessel, boat, water craft, or raft, or other similar obstruction, sinking or grounding, or being unnecessarily delayed in any Government canal or lock, or in any navigable waters mentioned in section 414 of this title, in such manner as to stop, seriously interfere with, or specially endanger navigation, in the opinion of the Secretary of the Army, or any agent of the United States to whom the Secretary may delegate proper authority, the Secretary of the Army or any such agent shall have the right to take immediate possession of such boat, vessel, or other water craft, or raft, so far as to remove or to destroy it and to clear immediately the canal, lock, or navigable waters aforesaid of the obstruction thereby caused . . . provided further, That the actual expense, including administrative expenses, of removing any such obstruction as aforesaid shall be a charge against such craft and cargo; and if the owners thereof fail or refuse to reimburse the United States for such expense within thirty days after notification, then the officer or agent aforesaid may sell the craft or cargo, or any part thereof that may not have been destroyed in removal, and the proceeds of such sale shall be covered into the Treasury of the United States.

(b) Removal requirement. . . .

(c) Liability of owner, lessee, or operator. The owner, lessee, or operator of

9

authorize the government to remove vessels sunken in navigable waterways and to recover removal costs when the owner, lessee, or operator fails to prosecute immediate removal diligently as required by the third clause of § 409. Section 414(a) provides that whenever a navigable waterway has been obstructed by a sunken vessel for more than 30 days, or when the abandonment of the obstruction is legally established, the Secretary of the Army may have the obstructing vessel broken up, removed, sold, or otherwise disposed of. Section 415(a) is similar to § 414(a), except that it authorizes the United States through the Secretary of the Army, in an emergency, to take immediate possession of a sunken vessel that stops, seriously interferes with, or specially endangers navigation in any navigable waterway of the United States, and to remove or destroy such sunken vessel so as to eliminate the obstruction.

Section 414(b) provides that the owner, lessee, or operator of a sunken vessel removed from a navigable waterway pursuant to § 414(a) by the government "shall be liable to the United States for the cost of removal or destruction and disposal" of the vessel as provided for in § 414(a). Section 415(c)[9] similarly provides that the owner, lessee, or operator of a sunken vessel

---

such vessel, boat, watercraft, raft, or other obstruction as described in this section shall be liable to the United States for the actual cost, including administrative costs, of removal or destruction and disposal as described which exceeds the costs recovered under subsection (a) of this section. Any amount recovered from the owner, lessee, or operator of such vessel pursuant to this subsection to recover costs in excess of the proceeds from the sale or disposition of such vessel shall be deposited in the general fund of the Treasury of the United States.

[9] In 1996, Congress amended § 415(b) by re-designating this provision as § 415(c) and by striking "cost" and inserting "actual cost, including administrative costs." See Water Resources Development Act of 1996, S. 640, 104th Cong. § 218(b) (1996). The new provision that was added in 1996, now codified at 33 U.S.C. § 415(b), has no relevance to the present case. It provides for the duties of a vessel owner and the Secretary of the Army when the Coast Guard issues an order to stop or delay navigation in any navigable waters because of conditions related to the sinking or grounding of a vessel.

shall be liable to the government for the costs of removal on an emergency basis under § 415(a), except that in such case the removal costs shall include administrative expenses.

Applying the foregoing statutory provisions to the facts alleged by the United States in this case, we conclude that the government can state a claim upon which relief may be granted to it under the third clause of § 409 when read together with § 414 (a) & (b) (or § 415 (a) & (c)).

Specifically, the United States alleges that Southern Scrap was the owner and operator of a drydock that, by virtue of its being swept away and sunken by Hurricane Katrina, became a significant hazard to navigation in the Industrial Canal, one of the country's navigable waterways, and that the drydock was a sunken vessel, which under federal law had to be removed from the Industrial Canal in order to eliminate its hazard to navigation. The United States further alleges that, upon contacting representatives of Southern Scrap less than two weeks after Hurricane Katrina struck, it was advised that Southern Scrap was unable to remove its drydock from the Industrial Canal in a timely manner. Moreover, the United States alleges that, in the opinion of the Corps the drydock's obstruction stopped, seriously interfered with, or specially endangered navigation; and that the Secretary duly exercised his discretion to have the sunken vessel removed from the channel. Consequently, the United States avers, the Corps proceeded to have the sunken drydock removed for a cost of over $7 million, which greatly exceeds the value of the wrecked drydock. Accordingly, the United States alleges, Southern Scrap, as owner of the removed vessel, is liable to the United States for the cost of the sunken vessel's removal or destruction and disposal.

The foregoing facts alleged by the United States are sufficient to state the essential elements of a claim under § 409 of the Wreck Act, viz., that Southern

Scrap's vessel was wrecked and sunk in a navigable channel; that it was Southern Scrap's duty as its owner to commence the immediate removal of the same; that Southern Scrap failed to do so and thereby abandoned the craft and subjected it to removal by the United States as provided for in §§ 414 and 415 of the Wreck Act; that the government removed the sunken drydock from the navigable channel in accordance with these statutory provisions; and that Southern Scrap as owner and operator of the sunken drydock is liable to the United States for the cost of removal or destruction and disposal of that vessel.

Contrary to our interpretation of the foregoing statutory provisions, however, Southern Scrap contends that the Wreck Act affords the government the right to recover removal costs only in the event the owner, lessee, or operator of a vessel negligently causes it to sink in a navigable waterway. This follows, Southern Scrap argues, because the object of the 1986 amendments was merely to codify the Supreme Court's decision in Wyandotte Transp. Co. v. United States holding vessel owners liable for the government's costs in removing their negligently caused wrecks, not to enable the United States to recover its full expenses of wreck removal from non-negligent vessel owners, lessees, and operators. We cannot agree. Southern Scrap's interpretation of the current statute cannot be squared with the plain words of the 1986 amendments, the evident objects of the amendments, and the basic structure and scheme of the Wreck Act left intact by them.

As originally enacted, the first clause of § 409 of the Wreck Act prohibited "voluntarily or carelessly" sinking a vessel in a navigable channel. Based on that language, the Supreme Court in Wyandotte held that the United States could recover its costs of removing such wrecks from those channels from persons who negligently sank them. If Congress in the 1986 amendments had intended merely to codify Wyandotte and restrict the United States to that

12

negligence cause of action, it would have preserved the terms "voluntarily or carelessly" and probably would have elaborated upon the negligence theory in the first clause of § 409 or elsewhere in the statute. The 1986 amendments, however, took a tack away from negligence theory by deleting the words "voluntarily or carelessly" from the first clause of § 409 and by amending and affecting other provisions of the Wreck Act so as to expand the potential for vessel owners' liability without fault for governmental wreck removal costs.

The third clause of § 409, unlike the first clause, has always imposed a direct duty on non-negligent owners whose vessels sank in navigable channels to remove them or else risk the consequence of having the government remove them as provided for in §§ 414 and 415 of the Wreck Act.[10] Originally, §§ 414 and 415 only imposed upon such owners in rem liability for the government's removal costs up to the value of the wrecked vessel and its cargo. But in the 1986 legislation, §§ 414 and 415 were amended to provide that the owners, lessees, and operators of vessels sunken in navigable channels shall be liable to the United States for its costs in removing such sunken vessels that exceed the in rem value of the wreck. In other words, the 1986 legislation, in essence, amended §§ 414 and 415 of the Wreck Act to provide that, in addition to a sunken vessel owner's former in rem liability under those sections, an owner, lessee, and operator shall also be liable to the United States for the actual cost of a wreck removal which exceeds the in rem value of the wreck.

For these reasons, we conclude that the 1986 amendments to the Wreck Act were not designed to codify Wyandotte or the negligence cause of action it discovered in the Act as Southern Scrap contends, but were intended to grant

---

[10] The 1986 amendments did not alter the structure, scheme, or nature of the third clause of § 409.

the United States the substantive statutory right to hold vessel owners, lessees, and operators personally liable for the government's removal costs when they fail to comply with their duty to remove sunken vessels from navigable waters under § 409 of the Act.[11] Accordingly, we also conclude that the United States can state a personal liability claim against Southern Scrap under the Wreck Act for the recovery of its actual cost of removing the drydock from the Industrial Canal without alleging that the vessel owner negligently caused the sinking.

B. The Limitation Act does not apply to limit the United States' recovery of wreck removal costs under the Wreck Act.

This Court in University of Texas held that the Limitation Act[12] did not apply to the United States' civil suit under § 409 of the Wreck Act for wreck-removal expenses against parties negligently responsible for the wreck. 557 F.2d at 452. While the University of Texas Court was not called upon to address

---

[11] The legislative history of the 1986 amendments to the Wreck Act and the Corps's implementing regulations relating to those amendments support this conclusion. When the Senate passed the 1986 amendments, the Senate Report explained that "[u]nder present law, Corps costs for removal can only be offset by the salvage value of the wreck. In the case of abandoned vessels, this is usually far less than the cost of removal." S. REP. NO. 99-126, at 26 (1985). Under the new amendments, according to the Senate, "any owner or operator of a vessel must reimburse the United States for expenses covering its salvage, if wrecked." Id. (emphasis added). Likewise, the Corps has interpreted the 1986 amendments to mean that "[t]he abandonment of a wreck or other obstruction does not remove the owner's liability for the cost of removal and disposal if removal is undertaken by the Corps of Engineers, except in cases of nonnegligent sinking which occurred prior to November 17, 1986." 33 C.F.R. § 245.45(f).

[12] The Limitation Act provides in pertinent part:

> The liability of the owner of any vessel, whether American or foreign, for any . . . loss, damage or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not (except in cases of personal injury) . . . exceed the amount or value of the interest of such owner in such vessel, and her freight then pending.

46 App. U.S.C. § 183, revised at 46 U.S.C. § 30505 et seq.

the impact of the Limitation Act in the context of a non-negligent sinking – and of course was decided under the pre-1986 version of the Wreck Act – its underlying principles when combined with the plain words and evident objects of the 1986 amendments compel us to conclude again that the Limitation Act does not apply to limit the United States' recovery under the Wreck Act in this case.[13]

First, Congress made a clear policy choice in the 1986 amendments to supersede with unlimited personal liability the in rem liability limitation that vessel owners had enjoyed under the previous versions of §§ 414 and 415 of the Wreck Act. Thus, it is very unlikely that Congress intended for vessel owners to be able to cancel out this legislative decision by relying on the similar in rem protection of the 1851 Limitation Act. Permitting Southern Scrap to invoke the Limitation Act in this case would nullify the effect of the new §§ 414(b) and 415(c), which we have determined impose unlimited personal liability upon a vessel owner for governmental removal costs, when the owner fails to comply with its obligation to remove its sunken vessel from a navigable waterway. See In re Transporter Marine, Inc., 217 F.3d 335, 338 (5th Cir. 2000) (explaining that Wreck Act claims arise "from statutory authority creating an independent statutory duty on the part of the shipowner" and that to subject such claims to limitation "would thwart the expressed intent of Congress – removal of sunken vessels that are hazards to navigation"); cf. Univ. of Texas Med. Branch at Galveston, 557 F.2d at 453 (disallowing application of the Limitation Act there because it "would merely reinstate at another level the limitation on a negligent

---

[13] We note that on another occasion, in United States v. Nassau Marine Corp., 778 F.2d 1111, 1114 (5th Cir. 1985), this Court stated in dicta that "non-negligent shipowners may be entitled to limit their liability under [the Limitation Act]." We of course are not bound by dicta, and in any event Nassau Marine was decided before the enactment of the 1986 amendments to the Wreck Act.

party's liability that Wyandotte had removed by authorizing an in personam suit").

Second, in concluding that the Wreck Act "implicitly limits the scope of the Limitation Act," 557 F.2d at 452, the University of Texas Court applied the longstanding principle that when two statutes irreconcilably conflict, the more recent statute controls. Id. at 455 ("This is not to say that the Limitation Act no longer has any vitality. It is rather to say that its force succumbs to that of a later statutory enactment which, when still later construed by the Supreme Court in a manner that wars with the policies of the Limitation Act, must prevail over the earlier Act.").[14] Under the pre-1986 version of the Wreck Act, the conflict, or "wide breach," as the University of Texas Court called it, between the 1899 Wreck Act and 1851 Limitation Act arose from Wyandotte's determination that "the United States could sue the negligent owner personally for wreck removal expenses even though the latter had abandoned his vessel." Id. at 451.[15] Thus, the University of Texas Court found that "[i]n order fully to effectuate the policies of the [Wreck Act] as interpreted by the Supreme Court

---

[14] See Reg'l Rail Reorganization Act Cases, 419 U.S. 102, 134 (1974) ("A new statute will not be read as wholly or even partially amending a prior one unless there exists a positive repugnancy between the provisions of the new and those of the old that cannot be reconciled.") (quotations and citations omitted); Morton v. Mancari, 417 U.S. 535, 550 (1974) ("In the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable."); I.C.C. v. S. Ry. Co., 543 F.2d 534, 539 (5th Cir. 1976) ("Under the usual rules of statutory construction, where there is a conflict between an earlier statute and a subsequent enactment, the subsequent enactment governs."); see also United States v. Lara, 181 F.3d 183, 198 (1st Cir. 1999) ("Courts generally adhere to the principle that statutes relating to the same subject matter should be construed harmoniously if possible, and if not, that more recent or specific statutes should prevail over older or more general ones.").

[15] Prior to Wyandotte, this Court explained that "[i]t was possible to find [the Wreck Act and Limitation Act] consistent and, indeed, complementary as long as the shipowner was able effectively to limit his liability merely by abandoning his vessel." Univ. of Texas Med. Branch at Galveston, 557 F.2d at 451.

in Wyandotte, then, it is impossible to give full effect to the Limitation Act." Id.; see also In re Chinese Mar. Trust, Ltd., 478 F.2d 1357, 1359 (2d Cir. 1973) ("The [Limitation] Act must be construed, however, in the light of subsequently enacted legislation and regulations designed to insure that our country's navigable waterways will be kept free of obstructions."). Following the 1986 amendments, the conflict between the two statutes is even more pronounced, for the non-negligent owner is no longer able to automatically limit his liability under either §§ 414 or 415 simply by abandoning his vessel. Rather, the new §§ 414(b) and 415(c) now permit the United States to hold a non-negligent vessel owner personally liable for the total amount of governmental wreck removal costs when it fails to remove its sunken vessel as required by the third clause of § 409. By contrast, "the language of the Limitation Act provides for a limitation on the total of all recoverable damages in a marine accident to the post-accident value of the ship and its cargo, no matter how many claimants there may be." Tug ALLIE-B, Inc. v. United States, 273 F.3d 936, 942 (11th Cir. 2001) (citing 46 U.S.C. app. § 183(a)). Clearly, then, the two statutes irreconcilably conflict in respect to the nature and scope of a vessel owner's liability when the United States sues to recover wreck removal costs. Were we to hold otherwise, i.e., that the United States' right to recover such costs expressly set forth in §§ 414(b) and 415(c) can still be limited by the owner of a sunken vessel under the Limitation Act, we would effectively render the new clauses meaningless, thereby "violat[ing] the canon of statutory construction that discourages courts from adopting a reading of a statute that renders any part of the statute mere

surplusage." Id. at 944 (citing Bailey v. United States, 516 U.S. 137, 146 (1995)).[16]

Finally, this Court in University of Texas persuasively explained, through detailed reference to the legislative history of the Limitation Act, why that Act should not be extended to cases involving the United States' recovery of wreck removal expenses pursuant to the Wreck Act. See Univ. of Texas Med. Branch at Galveston, 557 F.2d at 454-55. We noted that the stated purpose of the Limitation Act "was to place this country's 'mercantile marine upon the same footing as that of Great Britain.'" Id. at 454 (quoting 23 Cong. Globe, 31st Cong., 2d Sess. 714 (Remarks of Sen. Davis, February 26, 1851)). Yet, "throughout the nineteenth century and, indeed, until recently, the law of Great Britain has been that the limitation of liability afforded shipowners does not extend to shipowners' liability for wreck removal expenses." Id. Accordingly, we concluded that "it is doubtful that Congress, in 1851 or in 1899, specifically intended the Limitation Act to apply where its English counterpart did not." Id. at 454-55.

For these reasons, we conclude, as we did in University of Texas, that in this case "the Limitation Act does not wreck the Wreck Act and the Wreck Act is not limited by the Limitation Act." Id. at 455.

---

[16] In addition to the Wreck Act, courts have found that other later-enacted statutes impliedly repealed the Limitation Act for cases arising under those statutes. See Tug ALLIE-B, 273 F.3d at 948-49 (holding that the Limitation Act does not apply to claims brought under the Park System Resource Protection Act); Complaint of Metlife Capital Corp., 132 F.3d 818, 822 (1st Cir. 1997) (holding that the Limitation Act does not apply to claims brought under the Oil Pollution Act); In re The Glacier Bay, 944 F.2d 577, 583 (9th Cir. 1991) (holding that the Limitation Act does not apply to claims brought under the Trans-Alaska Pipeline Authorization Act); United States v. CF Indus., Inc., 542 F. Supp. 952, 955-56 (D. Minn. 1982) (holding that the Limitation Act does not apply to claims brought under the Clean Water Act); cf. Transporter Marine, 217 F.3d at 339-40 (holding that Coast Guard alcohol and drug regulations are not subject to the Limitation Act).

## V. CONCLUSION

Accordingly, the judgment of the district court lifting and modifying its injunction so as to allow the United States to bring its personal liability claim against Southern Scrap for the recovery of its actual costs in removing Southern Scrap's drydock from the navigable waters of the Industrial Canal, without alleging that the vessel owner negligently caused the sinking, is AFFIRMED insofar as it is consistent with the foregoing opinion.