# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 28, 2010

No. 09-30378

Lyle W. Cayce
Clerk

DANOS MARINE INC; DANOS & CUROLE MARINE CONTRACTORS, LLC,

Plaintiffs – Appellants Cross-Appellees

v.

CERTAIN PRIMARY PROTECTION AND INDEMNITY UNDERWRITERS, Subscribing Severally to Policy Number C0I-3400773; CERTAIN EXCESS PROTECTION AND INDEMNITY UNDERWRITERS, Subscribing Severally to Policy Number BO702/LF0-21040T,

Defendants – Appellees Cross-Appellants

Appeal from the United States District Court
for the Eastern District of Louisiana

Before HIGGINBOTHAM, DAVIS and BENAVIDES, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Appellants filed this suit to recover costs of wreck removal from P&I underwriters of the liftboat ANDRE DANOS resulting from the capsizing and sinking of that vessel in the Gulf of Mexico during Hurricane Katrina. The district court found that the wreck removal costs were covered by the policy but that the value of the salvage of the sunken vessel exceeded the removal costs and denied recovery.

No. 09-30378

We agree that the costs of removing the wreck are covered but disagree that the value of the salvage exceeded those costs. For reasons that follow, we reverse and remand for further proceedings.

I

Plaintiff-Appellant Danos Marine, Inc. ("Danos Marine") is a Louisiana corporation owned by Allen Danos. Danos Marine owned two liftboats, ANDRE DANOS and SARAH DAVID. Plaintiff-Appellant Danos & Curole Marine Contractors, LLC ("Danos & Curole") is a Louisiana limited liability company owned by Allen Danos and his brother, Hank Danos.[1] Danos & Curole was the bareboat charterer and operator of the liftboat ANDRE DANOS. The bareboat charter agreement required Danos & Curole to obtain insurance on ANDRE DANOS. The charter also required Danos & Curole to return ANDRE DANOS to Danos Marine in the same condition as when the charter commenced. Danos & Curole purchased Protection & Indemnity ("P & I") insurance from the Underwriters, the Defendants-Appellees. The P & I policy, which included both Danos companies as named insureds, included coverage for wreck removal expenses. The hull of ANDRE DANOS was insured by a different insurer for $3,285,000, with a deductible of $1,000,000. Danos & Curole owned six liftboats, which it operated in addition to the ANDRE DANOS and the SARAH DAVID.

In 2004, Allen and Hank Danos decided to sell all eight liftboats and related assets owned by the two Danos companies. They hired an investment banker to present a bid proposal package to prospective purchasers. ANDRE DANOS was appraised for $4,000,000, and SARAH DAVID was appraised for $4,700,000. On August 24, 2005, Hercules, a liftboat operator, submitted the highest bid, $42,000,000 for all vessels and related assets. The Danos companies

---

[1] The plaintiffs' companies are collectively referred to as the "Danos' companies."

2

No. 09-30378

countered at $45,000,000, and Hercules conditionally accepted the counter -offer. In that counter-offer Hercules conditionally agreed to pay the appraised value of $4,000,000 for the ANDRE DANOS and $4,700,000 for the SARAH DAVID to the boats' owner, Danos Marine. The remainder of the purchase price was to be paid to Danos & Curole.

The next day Hurricane Katrina hit the Louisiana coastline and capsized the ANDRE DANOS. Shortly after the storm, Hercules and the Danos' companies resumed negotiations. At that point, although the parties knew that ANDRE DANOS suffered damage, the value of the boat could not be ascertained because it was still submerged. Relatedly, the appellants offered evidence that the widespread damage to oilfield equipment in the area drove up the prices of operating liftboats, including the appellants' seven other liftboats. According to the appellants, although ANDRE DANOS obviously lost value, the other seven liftboats appreciated in value due to the destruction of liftboats and other oilfield equipment along the coastline as well as increased demand for this equipment. In other words, the resumed negotiations not only entailed subtracting value from the bid due to the sinking of ANDRE DANOS, the negotiations also included adding value to the other seven liftboats because their market value had increased due to the change in supply and demand for liftboats after the hurricane.

The parties' negotiations post-Katrina ultimately resulted in an agreed purchase price of $44,000,000 for all eight vessels. In the Amended Purchase Agreement (APA), Hercules agreed: (1) to pay $500,000 toward the cost of raising the capsized boat; and (2) to reimburse Danos $1,000,000 for the deductible with respect to the hull policy on ANDRE DANOS. Although ANDRE DANOS was still submerged at the time of the agreement, the APA contained a schedule that allocated the purchase price among the eight vessels, listing the purchase price of "L/B Andre Danos" as $500,000. Additionally, the parties

3

No. 09-30378

added Article 6.8 to the agreement to treat the transfer of ownership of ANDRE DANOS in a different manner than the other seven liftboats, which were to be transferred to Hercules at the closing of the transaction. They agreed to transfer the ownership of ANDRE DANOS on the date repairs were completed or at the closing, whichever occurred later.[2]

On October 17, 2005, Danos & Curole obtained a survey report indicating that the wrecked ANDRE DANOS "has no value as it lies, capsized and partially sunk in the Gulf of Mexico and is most likely a liability;" however, "[a]ssuming that the vessel is salvaged under the current 'No Cure, No Pay' contract, it is the opinion of the undersigned that the hull and salvaged appurtenances would have an estimated value in the range of $450,000 depending upon the extent of salvage related damage." Prior to closing, Hercules inquired of Hank Danos as

---

[2] Specifically, Article 6.8 provided as follows:

**6.8** *Andre Danos.* The Sellers agree that they will, as soon as is reasonably practical following the date of this Agreement, salvage and repair (to the extent it is not a Total Loss) the *Andre Danos.* The Sellers shall use their commercially reasonable best efforts to pursue their insurance claims. If the vessel is not a Total Loss, the Sellers shall cause the *Andre Danos* to be repaired in a reputable shipyard, to be mutually agreed to by the Buyer and the Sellers, and shall apply all available insurance proceeds toward the repair of the *Andre Danos.* Once insurance proceeds are completely expended, should additional repairs to the *Andre Danos* be required, Buyer will be responsible for finding such repairs. If it is determined that the damage to the *Andre Danos* suffered during Hurricane Katrina and/or during the salvage operation has resulted in the vessel being a Total Loss, then the Purchase Price shall be adjusted downward by an amount equal to the total insurance proceeds paid by the Sellers with respect to the *Andre Danos.* If the full Purchase Price has already been paid, then the Sellers will reimburse the Buyer for any amounts that would have been deducted from the Purchase Price under the previous sentence. Nothing in this Section 6.8 will affect the Buyer's obligation to pay the salvage costs of the *Andre Danos* and to pay the deductible under the Sellers' applicable insurance policies, as provided in Section 1.3 hereof. Notwithstanding anything to the contrary set forth herein, delivery of the *Andre Danos* shall occur on the later to occur of (1) the Closing, and (2) upon completion of such repairs. The Sellers shall deliver, and the Buyer shall accept, the *Andre Danos* in federal or international waters in the Gulf of Mexico.

No. 09-30378

to how the Danos companies wanted the purchase price divided between Danos Marine, Inc. and Danos & Curole Marine Contractors, LLC. Hank Danos instructed Hercules to divide the funds as per the pre-Katrina agreement. The sale closed on November 8, 2005. At that time, ANDRE DANOS had not been removed from the Gulf of Mexico.

On September 5, 2005, in an attempt to recover ANDRE DANOS, Danos & Curole entered into a salvage contract with Coral Marine. Coral Marine attempted to salvage the vessel but Hurricane Rita slammed into the Gulf, shutting down salvage operations. Rita caused the vessel to shift in such a position that Coral Marine's equipment was inadequate to remove it. After Rita struck, none of the vessel was showing above the surface of the Gulf; it was submerged approximately six feet below the surface. Coral Marine hired Don Jon Marine to remove the wreck. On October 19, Don Jon brought the boat to the surface, but the slings broke and the boat sank to the ocean floor. Eventually, on May 16, 2006, Danos & Curole contracted with Bisso Marine Inc. to remove the vessel. On May 28, Bisso brought the wrecked vessel to shore. Danos & Curole attempted to sell it for scrap, but the cleaning costs were prohibitive. Instead, Danos & Curole had to pay Larose Salvage & Scrap $150,000 to dispose of the wreck. The total cost of removal, including the marking, raising and disposing of the wreck, was $2,049,911.22.

Pursuant to the APA, because ANDRE DANOS was a total loss, Danos & Curole refunded $785,000 to Hercules. This amount represented the insurance proceeds ($2,285,000) minus the deductible ($1,000,000) and Hercules' share of salvage costs ($500,000), all as agreed to in the APA.

The Danos' companies filed a claim with the Defendant-Appellee Underwriters for the costs of removing the wreck, and the Underwriters denied coverage. The Danos' companies then filed suit against the Underwriters, seeking $2,040,911.22 for the costs of removal. The Danos' companies filed a

No. 09-30378

motion for partial summary judgment, seeking a ruling that removal costs of the wreck were covered under the policy.  The Underwriters filed a cross motion for summary judgment, seeking a ruling that coverage was not afforded for these expenses because the removal was not compulsory and alternatively that the amount Danos received for the vessel from Hercules exceeded the removal costs. The court granted Danos' motion in part, ruling that the plaintiffs had a non-delegable duty to remove the vessel because it was an obstruction and therefore the policy covered costs of wreck removal.   The court also granted the Underwriter's motion in part, holding that Danos sold the wrecked vessel for $4,000,000 and because this exceeded the cost of removing the wreck, Danos was not entitled to any recovery. The court then entered a take nothing judgment in favor of the defendants.  The Danos' companies filed a timely notice of appeal and the Underwriters cross-appealed.

II

This appeal requires us to interpret and apply to the facts of this case the following provision in defendant's P&I policy which states that it will indemnify the insureds for:

> Liability for cost or expense of, or incident to, the removal of the wreck of the vessel named herein when such removal is compulsory by law, provided, however, that:
>
> (a) There shall be deducted from such claim for cost or expenses, the value of any salvage from or which might have been recovered from the wreck, inuring, or which might have inured, to the benefit of the Assured.

More specifically, the questions are:  (1) whether the removal of the wrecked vessel from the Gulf of Mexico was "compulsory by law"; and (2) what, if any, of the funds involved in the Appellants' sale of the liftboats to Hercules

constitute "value of any salvage" recovered from the wreck to be deducted from the removal costs.

## A

The district court granted a partial summary judgment, holding that the removal of the ANDRE DANOS was "compulsory by law." This Court, sitting en banc, has previously interpreted this particular phrase contained in an insurance policy in a suit to recover the costs of removal of a wrecked vessel. *See Continental Oil Co. v. Bonanza Corp.*, 706 F.2d 1365 (5th Cir. 1983) (en banc). Like the instant case, in *Bonanza*, the policy extended coverage for the expenses involved in removal of a wrecked vessel "only when removal is compulsory by law." *Id.* at 1369. This Court rejected the Second Circuit's position that the phrase "compulsory by law" was a term of art that meant that removal was covered only when a governmental body orders such removal. *Id.* (citing *Seaboard Shipping Corp. v. Jocharanne Tugboat Corp.*, 461 F.2d 500, 504 (2d Cir. 1972)). Instead, this court concluded that the words should be "construed in their plain, ordinary, and popular sense." *Id.* (internal quotation marks and citations omitted). Ultimately, to determine whether a removal was legally compelled, this court adopted a test that asked whether a reasonable insured would have effected a removal. This Court determined that removal is compulsory "when a reasonable owner, fully informed, would conclude that failure to remove would likely expose him to liability imposed by law sufficiently great in amount and probability of occurrence to justify the expense of removal." *Id.* at 1372.

The district court concluded that the Appellants had a compulsory obligation under the Wreck Act to remove the capsized vessel. The district court relied on 33 U.S.C. § 409, which provides that "whenever a vessel . . . is wrecked and sunk in a navigable channel, . . . it shall be the duty of the owner, lessee, or operator of such sunken craft to commence the immediate removal of the same."

The Wreck Act "addresses the problem of obstructions caused by sunken vessels." *Univ. of Tx. Med. Branch at Galveston v. United States,* 557 F.2d 438, 444 (5th Cir. 1977); *see* 33 U.S.C. §§ 409, 411, 412, 414, and 415. Congress's purpose in enacting the Wreck Act was "'the protection of other vessels plying the same waters' as the sunken vessels." *In re Southern Scrap Material Co.*, 541 F.3d 584, 588 (5th Cir. 2008) (quoting *United States v. Raven,* 500 F.2d 728, 732 (5th Cir. 1974)).

As Cross-Appellants, the Underwriters argue that the Wreck Act does not impose a compulsory obligation to remove a wrecked vessel in every instance and that whether a reasonable owner would have removed the wreck is a question of fact. As set forth above, in this circuit, an order by a governmental authority is not necessary to demonstrate that a removal is compulsory by law. Although the Underwriters argue that a fact issue is presented as to whether it was reasonable for the Appellants to effect the removal, the Underwriters do not point to any disputed fact. For instance, with respect to the requirements of § 409 of the Wreck Act, the Underwriters do not dispute either that ANDRE DANOS had sunk or that it sunk in a navigable channel.

The Underwriters also contend that the Wreck Act does not impose a duty of removal on former owners or former operators of vessels. Thus, the Underwriters assert that the plain language of the statute demonstrates that *former* owners or operators have no obligation to remove a vessel under the Wreck Act.

We need not address this legal argument because viewing the facts in the light most favorable to Appellants, the amended purchase agreement makes clear that the ownership of ANDRE DANOS did not transfer to Hercules until the later of the Closing of the sale or repair of the ANDRE DANOS. Since the vessel was never repaired, ownership was never transferred from Appellants to

Hercules.    Thus, Danos Marine was the owner of the vessel when she was raised.

In sum, the district court correctly determined that a reasonable, fully informed owner (Danos Marine) would conclude that failure to remove ANDRE DANOS would likely expose him to liability pursuant to the Wreck Act and justify the expense of removal.  *See Bonanza*, 706 F.2d at 1372.   The Underwriters have therefore failed to demonstrate that the district court erred in determining that the Wreck Act imposed a compulsory obligation on Danos Marine to remove the sunken vessel.

B

After determining that the removal was compulsory by law, the district court next had to determine whether any salvage value was recovered from the wreck pursuant to the P & I policy.  As previously set forth, the P&I policy provided  that: "There shall be deducted from such claim for cost or expenses, the value of any salvage from or which might have been recovered from the wreck, inuring, or which might have inured, to the benefit of the Assured."  It is undisputed that ANDRE DANOS was a total loss when it was recovered from the sea and Danos Marine was unable to sell the wreck for scrap.  In fact, Danos & Curole had to pay $150,000 to have the wreck taken to the scrap yard.

The district court concluded that the wrecked ANDRE DANOS had a value of  $4,000,000–its pre-hurricane appraisal and the amount allocated to the purchase of that vessel– and because this sum exceeded the cost of removing the vessel, plaintiffs were entitled to no recovery.  Since it is uncontested that when the ANDRE DANOS was finally raised it had a negative value, the question narrows to what relevance, if any, should we attach to the sums allocated to the purchase price of the ANDRE DANOS in determining the "value of any salvage" recovered  from  the  wreck  of  the  ANDRE  DANOS.   In  other  words,  in determining the amount of the credit the Underwriters are entitled to deduct

9

from costs of wreck removal, do we look to the actual amount recovered for the recovered wreck or do we look to the amount of the purchase price allocated by the Danos' companies for the purchase price of the ANDRE DANOS?

Underwriters point to the evidence that the appellants received $4,000,000 of the total purchase price for the ANDRE DANOS which was the same value allocated to this vessel before the hurricane and before she sank.[3] The district court relied on this fact to establish the value of the "salvage recovered from the wreck." The district court stated "[t]here is nothing in the APA to reflect otherwise." This statement is incorrect. The APA contained a schedule that allocated the purchase price of the eight vessels and listed the purchase price of "L/B Andre Danos" as $500,000.

On the other hand, appellants contend that the district court erred in its evaluation because none of the money paid by Hercules to Danos Marine constituted "value of any salvage recovered from the wreck." The plain language of the policy supports this argument as the provision allows a credit from the costs of removal, "the value of any *salvage . . .* recovered from the wreck," "Salvage" has been defined as: "The property saved or remaining after a fire or other loss, sometimes retained by an insurance company that has compensated the owner for the loss." BLACK'S LAW DICTIONARY 1457 (9th ed. 2009). Applying this definition, the value of the property remaining after the loss of ANDRE DANOS was zero. *See also* L. Buglass, *Marine Insurance and General Average in the United States*, 386 (2d ed. 1981) (explaining that "[c]redit is to be given for the value of any salvage recovered as a result of the removal").

---

[3] The Danos' companies explain that this allocation was used because the charter agreement provided that Danos & Curole must insure or return the ANDRE DANOS to Danos & Marine. Although the Underwriters attempt to discredit this explanation, ultimately their brief acknowledges that the allocation was "to resolve a potential breach of charter claim." Red brief at 55.

No. 09-30378

In determining the value of the salvage, the terms of the policy control. The policy plainly allows the insurer a credit only for the value of the salvage recovered from the wreck, i.e., the value of the recovered property.

The economic reality in this transaction is clear: Hercules wanted seven floating, fully operational liftboats and agreed on a price of $44,000,000 for those boats. Two brothers owned the entities which owned the vessels and they decided for their own reasons, how to allocate the price for the eight vessels. This decision was an internal one between these two family businessmen and is irrelevant to the determination of the "value of the salvage" of the wreck ANDRE DANOS.

### III

We agree with the district court that the plaintiffs had an obligation under the Wreck Act to remove the wreck of the ANDRE DANOS and that plaintiffs incurred removal expenses in the amount of $2,049,911.22. We conclude, however, that the district court erred in allowing any credit against the cost of removing the wreck because plaintiffs recovered nothing from the recovered property. We therefore vacate the take nothing judgment and remand this case to the district court for further proceedings consistent with this opinion.

VACATED and REMANDED.