**REVISED DECEMBER 4, 2013**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 3, 2013

Lyle W. Cayce
Clerk

No. 12-60031

D.R. HORTON, INCORPORATED,

Petitioner/Cross-Respondent

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent/Cross-Petitioner

Petitions for Review of an Order of the
National Labor Relations Board

Before KING, SOUTHWICK, and GRAVES, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

The National Labor Relations Board held that D.R. Horton, Inc. had violated the National Labor Relations Act by requiring its employees to sign an arbitration agreement that, among other things, prohibited an employee from pursuing claims in a collective or class action. On petition for review, we disagree and conclude that the Board's decision did not give proper weight to the Federal Arbitration Act. We uphold the Board, though, on requiring Horton to clarify with its employees that the arbitration agreement did not eliminate their rights to pursue claims of unfair labor practices with the Board.

No. 12-60031

FACTS AND PROCEDURAL HISTORY

Horton is a home builder with operations in over twenty states. In 2006, Horton began requiring all new and existing employees to sign, as a condition of employment, what it called a Mutual Arbitration Agreement. Three of its provisions are at issue in this appeal. First, the agreement provides that Horton and its employees "voluntarily waive all rights to trial in court before a judge or jury on all claims between them." Second, having waived their rights to a judicial proceeding, Horton and its employees agreed that "all disputes and claims" would "be determined exclusively by final and binding arbitration," including claims for "wages, benefits, or other compensation." Third, Horton and its employees agreed that "the arbitrator [would] not have the authority to consolidate the claims of other employees" and would "not have the authority to fashion a proceeding as a class or collective action or to award relief to a group or class of employees in one arbitration proceeding."

These provisions meant that employees could not pursue class or collective claims in an arbitral or judicial forum. Instead, all employment-related disputes were to be resolved through individual arbitration.

Michael Cuda worked for Horton as a superintendent from July 2005 to April 2006; he signed a Mutual Arbitration Agreement. In 2008, Cuda and a nationwide class of similarly situated superintendents sought to initiate arbitration of their claims that Horton had misclassified them as exempt from statutory overtime protections in violation of the Fair Labor Standards Act ("FLSA"). Horton responded that the arbitration agreement barred pursuit of collective claims, but invited Cuda and the other claimants to initiate individual arbitration proceedings. Cuda then filed an unfair labor practice charge, alleging that the class-action waiver violated the National Labor Relations Act ("NLRA").

2

No. 12-60031

On January 3, 2011, an administrative law judge held that the Mutual Arbitration Agreement violated Sections 8(a)(1) and (4) of the NLRA[1] because its language would cause employees reasonably to believe they could not file unfair labor practice charges with the Board. On January 3, 2012, the Board issued a decision by two of its members – Chairman Mark Gaston Pearce and Member Craig Becker. Their order upheld the ALJ's determination that the Mutual Arbitration Agreement violated Section 8(a)(1) because employees would reasonably interpret its language as precluding or restricting their right to file charges with the Board.[2] The panel also determined, contrary to the ALJ's decision, that the agreement violated Section 8(a)(1) because it required employees to waive their right to maintain joint, class, or collective employment-related actions in any forum. The panel ordered Horton to rescind or revise the agreement to clarify that employees were not prohibited from filing charges with the Board, nor were they prohibited from resolving employment-related claims collectively or as a class. Horton filed a timely petition for review of the panel's decision, and the Board cross-applied for enforcement of the panel's order.

## DISCUSSION

This court will uphold the Board's decision "if it is reasonable and supported by substantial evidence on the record considered as a whole." *Strand Theatre of Shreveport Corp. v. NLRB*, 493 F.3d 515, 518 (5th Cir. 2007); *see also* 29 U.S.C. § 160(e). "Substantial evidence is such relevant evidence as a reasonable mind would accept to support a conclusion." *J. Vallery Elec., Inc. v.*

---

[1] It shall be an unfair labor practice for an employer–
(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [Section 7];
. . .
(4) to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this subchapter . . . .
29 U.S.C. § 158(a)(1) & (4).

[2] Brian Hayes, while listed as a panel member, recused himself.

No. 12-60031

*NLRB*, 337 F.3d 446, 450 (5th Cir. 2003) (quotation marks omitted). In light of the Board's expertise in labor law, "we will defer to plausible inferences it draws from the evidence, even if we might reach a contrary result were we deciding the case *de novo*." *Id*. This deference extends to both the Board's "findings of facts and its application of the law." *Id*. While the Board's legal conclusions are reviewed *de novo*, *Strand*, 493 F.3d at 518, its interpretation of the NLRA will be upheld "so long as it is rational and consistent with the Act." *Litton Fin. Printing Div., a Div. of Litton Bus. Sys., Inc. v. NLRB*, 501 U.S. 190, 201 (1991) (quotation marks omitted).

### I. Issues Regarding Composition of Board

#### A. Validity of Recess Appointment of Board Member

Late in the process for our review of these rulings, a sister circuit issued an opinion that, were we to adopt its reasoning, might result in our holding that the Board's rulings are of no effect because one of its members was improperly appointed. *See Noel Canning v. NLRB*, 705 F.3d 490 (D.C. Cir. 2013), *cert. granted* 133 S. Ct. 2861 (U.S. June 24, 2013) (No. 12-1281).[3] The D.C. Circuit vacated the order of a three-member panel of the Board based on its determination that the recess appointments of the panel members were invalid. *Id.* at 499. The Recess Appointments Clause of the Constitution empowers the President to "fill up all Vacancies that may happen during the Recess of the

---

[3] The Supreme Court granted certiorari to consider: (1) "Whether the President's recess-appointment power may be exercised during a recess that occurs within a session of the Senate, or is instead limited to recesses that occur between enumerated sessions of the Senate" and (2) "Whether the President's recess-appointment power may be exercised to fill vacancies that exist during a recess, or is instead limited to vacancies that first arose during that recess." Petition for Writ of Certiorari, *NLRB v. Canning*, 2013 WL 1771081, at *1 (No. 12-1281). In addition to the questions presented in the petition for writ of certiorari, the Court directed the parties to brief and argue a third question: "Whether the President's recess-appointment power may be exercised when the Senate is convening every three days in *pro forma* sessions." Order Granting Certiorari, *NLRB v. Canning*, 133 S. Ct. 2861 (No. 12-1281) (June 24, 2013).

4

No. 12-60031

Senate." U.S. CONST. art. II, § 2, cl. 3. The court held that the clause applies only to recesses that occur between the two annual sessions of Congress, not recesses within a session. *Noel Canning*, 705 F.3d at 503. Because the appointments were not made during an intersession recess, they were invalid. *Id.* at 507.

The court also addressed whether the vacancies were invalid because they did not "happen" during a Senate recess. *Id.* Examining different possible definitions of "happen," the court held that a vacancy happens "only when it first arises, demonstrating that the Recess Appointments Clause requires that the relevant vacancy arise during the recess." *Id.* Consequently, the court held that the appointments were also invalid because the vacancies pre-existed the recess in which the appointments were made. *Id.* at 514.

Although *Noel Canning* is not binding on this court, it calls into question the constitutionality of Member Becker's recess appointment and the resulting validity of the Board's order. Horton, though, has never challenged the constitutionality of Member Becker's appointment. It has argued instead that Member Becker's appointment expired before the decision was issued. In light of *Noel Canning*, we asked the parties to submit new briefing regarding whether, for jurisdictional reasons, we must consider the constitutionality of Member Becker's appointment. We conclude that we do not.

First, the NLRA's jurisdictional statement supports the conclusion that we are not deprived of appellate jurisdiction because of defects in a Board order:

> The Board shall have power to petition any court of appeals of the United States . . . for the enforcement of such order . . . . *Upon the filing of such petition, the court . . . shall have jurisdiction of the proceeding* and of the question determined therein, and shall have power . . . to make and enter a decree enforcing, modifying and enforcing as so modified, or setting aside in whole or in part the order of the Board.

5

29 U.S.C. § 160(e) (emphasis added). This court's jurisdiction is derived from the Board's filing of a petition, not from the validity of the Board's underlying decision.

Second, challenges under the Appointments Clause are "nonjurisdictional structural constitutional objections" that are within a court's discretion to consider. *Freytag v. Commissioner*, 501 U.S. 868, 878-79 (1991). In *Freytag*, the Supreme Court considered a belated challenge to a special trial judge's appointment, but made clear that doing so was a discretionary exercise appropriate only in "rare cases." *Id.* at 879. Applying that decision, both the Sixth and the Eighth Circuits have determined that challenges to the Board's composition are nonjurisdictional. *See NLRB v. RELCO Locomotives, Inc.*, – F.3d — , 2013 WL 4420775, at *26-28 (8th Cir. 2013); *GGNSC Springfield LLC v. NLRB*, 721 F.3d 403, 406-07 (6th Cir. 2013); *see also Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 574 F.3d 748, 755-56 (D.C. Cir. 2009) (declining to consider constitutional challenge to copyright royalty judges' appointment).[4]

Third, the *Noel Canning* court itself did not hold that the constitutional issues implicated subject matter jurisdiction. Rather, it first resolved the appellant's statutory arguments. *See Noel Canning*, 705 F.3d at 493. Had the court considered the appellant's constitutional arguments as affecting the court's jurisdiction, it would have had to consider those arguments first before ruling on the merits of the petition. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998) (providing federal courts must resolve issues of subject matter

---

[4] The Third Circuit has resolved the issue differently, holding that the Board's three-member-composition requirement is jurisdictional. *See NLRB v. New Vista Nursing & Rehab.*, 719 F.3d 203, 212 (3d Cir. 2013). But as the *RELCO* court observed, the court in *New Vista* was partly constrained by prior Third Circuit precedent that "the overall authority of the Board to hear [a] case under the NLRA is a jurisdictional question that may be raised at any time." *New Vista*, 719 F.3d at 210 (alteration in original) (quoting *NLRB v. Konig*, 79 F.3d 354, 360 (3d Cir. 1996)) (internal quotation marks omitted).

No. 12-60031

jurisdiction before considering merits of a lawsuit).

Accordingly, the validity of Member Becker's recess appointment is not a matter we must address for jurisdictional reasons. It also is not an issue presented to us in the initial briefing. Further, a circuit-split now exists. *See Noel Canning*, 705 F.3d at 509. We find that the D.C. Circuit has explored the relevant sources, leaving little for us to add to the percolation of the issue other than to declare which side of the split we take. Finally, as our analysis will reveal, answering this newly-raised question would have only a marginal effect on this case. We leave the constitutional issue for the Supreme Court.[5]

We turn to Horton's other challenges to the Board's decision.

B. Expiration of Board Member's Recess Appointment

Horton contends that Member Becker's recess appointment expired before the Board issued its decision, which left the Board without authority to act because it lacked the necessary quorum of three members.[6] *See* 29 U.S.C. § 153.

The terms of those serving under recess appointments expire at the end of the next Senate session after the appointment. U.S. CONST. art. II, § 2, cl. 3. The President appointed Member Becker on March 27, 2010, during the second

---

[5] In its supplemental brief, Horton urges that, in the event we enforce the Board's order, we allow Horton to raise its constitutional challenges because of "extraordinary circumstances." Pursuant to 29 U.S.C. § 160(e), "[n]o objection that has not been urged before the Board . . . shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." In Horton's view, such circumstances exist because if the Board's composition was unconstitutional, it lacked the authority to act when it issued the order under review; further, *Noel Canning* constitutes new authority that could not have been raised before the Board. The Eight Circuit recently rejected similar arguments in *RELCO Locomotives*. *See* 2013 WL 4420775, at *28-31. We follow that court's reasoning here. Horton has not explained why it failed or neglected to raise its constitutional challenge before the Board. The mere fact that *Noel Canning*, a decision not binding on us, had not yet been decided is irrelevant because all the legal arguments raised in that case were available to Horton from the outset.

[6] As mentioned, Member Haynes recused. Therefore, if Member Becker's recess appointment had expired prior to the issuance of the Board's decision, Chairman Pearce would be the only member voting in support of the decision.

7

No. 12-60031

session of the 111th Congress. Accordingly, if Member Becker was validly appointed, his term expired at the end of the first session of the 112th Congress.

Horton argues that the session ended when the Senate adjourned on December 17, 2011 or, alternatively, when it held its last *pro forma* session on December 30, 2011. Either date would mean that Member Becker's appointment expired before the Board issued its decision on January 3, 2012. A simple adjournment, though, does not end a session. The end of a session is caused either by the affirmative act of the Senate's adjourning *sine die*[7] or by the inactivity of no *sine die* vote prior to the commencement of the next session: "In the absence of a concurrent resolution, adjournment *sine die* is determined by the arrival of the constitutionally mandated convening of the new session on January 3." Henry B. Hogue, Congressional Research Service, *Recess Appointments: Frequently Asked Questions*, pg. 2 n.8 (June 7, 2013). A new session begins at noon on January 3 of each year. *See* U.S. CONST., amend. XX, § 2. Because there was no *sine die* adjournment on an earlier date, one Senate session ended on January 3, 2012, immediately before the next session began at noon. *See* 158 CONG. REC. S1 (daily ed. Jan. 3, 2012).

Whether the Board's decision was entered prior to noon is unclear from the record. This time-of-day question is supported by very little argument in the briefing and no evidence in the record. If the order was effectively entered in the afternoon after the next congressional session had begun, a new issue would arise. Nonetheless, because of the state of the record and the briefing, we consider the absence of proof about exactly when on January 3 the Board acted to constitute a waiver of the issue.

We rely, to this limited extent only, on the *de facto* officer doctrine. The Supreme Court has summarized the doctrine by saying it "confers validity upon

---

[7] *Sine die* means "without day." BLACK'S LAW DICTIONARY 1418 (8th ed. 2004). An "adjournment *sine die*" ends a session "without setting a time to reconvene." *Id.* at 44.

acts performed by a person acting under the color of official title even though it is later discovered that the legality of that person's appointment or election to office is deficient." *Ryder v. United States*, 515 U.S. 177, 180 (1995). The Court reviewed some of its precedents on the Appointment Clause and held that the *de facto* officer doctrine generally is inapplicable to a timely constitutional challenge to the appointment of an officer:

> We think that one who makes a timely challenge to the constitutional validity of the appointment of an officer who adjudicates his case is entitled to a decision on the merits of the question and whatever relief may be appropriate if a violation indeed occurred.

*Id.* at 182-83.

The timely challenge here was that Member Becker's appointment expired long before January 3. We have resolved that issue. Absent more being made of the contingencies that apply to January 3 itself, we conclude that no timely challenge to that aspect of the appointment has been presented.

We do not imply a similar conclusion about the relevance of the *de facto* officer doctrine to the more fundamental Appointments Clause issues addressed in *Noel Canning* which we have concluded need not be addressed today. We apply the doctrine here very much on the margins of the issue. Those margins are an unraised, specific issue that after all the presentation the parties desired to bring to the question, has no factual support nor meaningful legal argument.

The Board issued its decision within Member Becker's recess term, and Horton's argument that the Board lacked a quorum is without merit.

C. Delegation of Authority to Three-Member Panel

Horton also argues that the Board lacked authority to issue its decision because it had not been delegated authority to act as a three-member panel. "The Board is authorized to delegate to any group of three or more members any or all of the powers which it may itself exercise." 29 U.S.C. § 153(b). The statute

further states that "three members of the Board shall, at all times, constitute a quorum of the Board, except that two members shall constitute a quorum of any group designated pursuant to [the delegation clause]." *Id.*

Under Section 153(b), four members of the Board can properly delegate authority to a three-member panel, and two members of that panel may decide a case "if, for example, the third member had to recuse himself from a particular matter." *New Process Steel, L.P. v. NLRB*, 130 S. Ct. 2635, 2639 (2010). In *New Process Steel,* the issue was whether a four-member Board could delegate authority to three of its members, intending that when two of its members' recess appointments expired, the remaining two members could carry on the Board's business. *Id.* at 2638. The Court held that the statute required that the group consist of three members for the duration of the delegation. *Id.* at 2640. It is clear, then, that the Board could validly issue its decision through two of its members, provided that the Board delegated authority to a three-member panel and that such a panel still existed when the two members acted.

Though there is no other explicit statutory description of the mechanics of a delegation, "the Board quorum requirement and the three-member delegation clause should not be read as easily surmounted technical obstacles of little to no import." *Id.* at 2644. Horton argues that such a delegation did not occur, as there is no order or other evidence of an express delegation. No authority is cited explaining how the requisite delegation is to be made. One amici, the Council on Labor Law Equality, identifies several Board decisions that referred to a delegation of authority. For example, in one case, issued on December 30, 2011 – four days before the panel issued the order in this case – the panel's order stated that "[p]ursuant to the provisions of Section 3(b) of the [NLRA], as amended, the [Board] has delegated its authority in this proceeding to a three-member panel." *New Vista Nursing & Rehab., LLC*, Case 22-CA-29988, 2011 WL 6936391, at *1 (Dec. 30, 2011). The *New Vista* order suggests that some

other act caused the delegation, and the later order recognized it.

Regardless of how a delegation of authority is achieved or recognized, no party or amicus has provided authority that an express, written delegation is required before a three-member panel may act. Despite the Supreme Court's language in *New Process Steel* that delegation should not be treated as an inconsequential technical matter, we will not establish for the first time that an express order is required. There is no indication that the Board deviated from its customary practice of delegating authority to the three-member panel and allowing two members to decide the case when Member Hayes recused. We conclude it is particularly inappropriate to require an express delegation here because the Board only had three members. An express delegation would have been by three members to themselves as three members. We will infer that when the entire three-member Board decided to act, it gave itself authority to act as three members. On these facts, an express delegation would have been a semantical tying up of loose ends, without significance.

It might well be a good practice that the Board not treat delegation as an inconsequential technical matter and establish some practice for delegation. Such a practice might avoid a contrary ruling one day by a court.

*II. Pending Motions*

Another preliminary matter involves the composition of the record on appeal. While its petition was pending, Horton moved that this court take judicial notice of the arbitration demand Cuda submitted to the American Arbitration Association and Cuda's letter to the Board's Regional Director, seeking to withdraw his unfair labor practice charge. In the alternative, Horton asked the court to supplement the record with the withdrawal letter. The Board opposed Horton's motion, and moved to strike references to these documents in Horton's brief and require Horton to file a corrected brief. This court ordered these cross-motions carried with the case.

No. 12-60031

On April 8, 2008, Cuda, through his attorney, submitted an arbitration demand as a single plaintiff, not as a member of a purported class. Cuda's attorney later sent a letter to the Board's Regional Director, stating that he "would like to withdraw the charge filed against" Horton. Horton's interest in these documents stems from its belief that the Board's decision created the novel presumption that "an individual who files a class or collective action complaint or arbitration demand necessarily seeks to initiate group action with others." According to Horton, the Board's decision conflicts with the "procedural history" of the case because Cuda's arbitration demand named him as a single plaintiff and his withdrawal letter referred only to himself.

This court has "generally declined to supplement the appellate record with materials not presented to the district court, though [it has] the discretion to do so." *Bd. of Miss. Levee Comm'rs v. EPA*, 674 F.3d 409, 417 n.4 (5th Cir. 2012). It is undisputed that these documents were never before the Board, so it is impossible to know what impact, if any, they would have had on the Board's decision. Furthermore, Horton's argument that these documents reveal some sort of inconsistency in the Board's decision, is factually inaccurate. Although Cuda's arbitration demand referenced only himself, it included a complaint that clearly described the parties as including "all other similarly situated employees." Therefore, it would be incorrect to say that, as a matter of procedural history, Cuda acted individually, and not with the intent to initiate a collective action. Furthermore, Horton makes no argument that these documents would deprive this court of jurisdiction.

We decline to take judicial notice of these documents or supplement the record. Because Horton's appellate brief contains only insignificant references to these documents, we decline to order Horton to file a corrected brief as requested by the Board.

12

No. 12-60031

*III. NLRA Sections 7 & 8(a)(1) and the Federal Arbitration Act*

The Board concluded that Horton violated Sections 7 and 8(a)(1) of the NLRA by requiring its employees to sign the Mutual Arbitration Agreement, which "precludes them from filing joint, class, or collective claims addressing their wages, hours or other working conditions against the employer in any forum, arbitral or judicial." In reaching this conclusion, the Board first determined that the agreement interfered with the exercise of employees' substantive rights under Section 7 of the NLRA, which allows employees to act in concert with each other:

> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, *and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection,* and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

29 U.S.C. § 157 (emphasis added). The Board deemed it well-settled that the NLRA protects the right of employees to improve their working conditions through administrative and judicial forums.

Taking this view of Section 7, the Board held that the NLRA protects the right of employees to "join together to pursue workplace grievances, including through litigation" and arbitration. The Board concluded that an "individual who files a class or collective action regarding wages, hours or working conditions, whether in court or before an arbitrator, seeks to initiate or induce group action and is engaged in conduct protected by Section 7 . . . central to the [NLRA's] purposes." In the Board's opinion, by requiring employees to refrain from collective or class claims, the Mutual Arbitration Agreement infringed on the substantive rights protected by Section 7.

13

No. 12-60031

The other statutory component of the Board's analysis is Section 8(a)(1) of the NLRA. It defines unfair labor practices by an employer: "It shall be an unfair labor practice for an employer – (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title . . . ." 29 U.S.C. § 158(a). In light of the Board's interpretation of Section 7, it held that Horton had committed an unfair labor practice under Section 8 by requiring employees to agree not to act in concert in administrative and judicial proceedings.

Horton and several amici disagree with this interpretation of Section 7. According to Horton, the NLRA does not grant employees the substantive right to adjudicate claims collectively. Additionally, Horton argues that the Board's interpretation of Sections 7 and 8(a)(1) impermissibly conflicts with the FAA by prohibiting the enforcement of an arbitration agreement.

We give to the Board "judicial deference when it interprets an ambiguous provision of a statute that it administers." *Lechmere, Inc. v. NLRB*, 502 U.S. 527, 536 (1992). "[T]he task of defining the scope of § 7 is for the Board to perform in the first instance as it considers the wide variety of cases that come before it . . . ." *NLRB v. City Disposal Sys., Inc.*, 465 U.S. 822, 829 (1984) (quotation marks omitted). Where "an issue . . . implicates its expertise in labor relations, a reasonable construction by the Board is entitled to considerable deference." *Id.* "Deference to the Board 'cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption . . . of major policy decisions properly made by Congress.'" *NLRB v. Fin. Inst. Emps. of Am., Local 1182*, 475 U.S. 192, 202 (1986) (alteration in original) (quoting *Am. Ship Bldg. Co. v. NLRB*, 380 U.S. 300, 318 (1965)). Particularly relevant to this dispute is that "the Board has not been commissioned to effectuate the policies of the Labor Relations Act so single-mindedly that it may wholly ignore other and equally important Congressional objectives." *Southern S.S. Co. v. NLRB*, 316 U.S. 31,

14

No. 12-60031

47 (1942). "Frequently the entire scope of Congressional purpose calls for careful accommodation of one statutory scheme to another, and it is not too much to demand of an administrative body that it undertake this accommodation without excessive emphasis upon its immediate task." *Id.* "[W]e have accordingly never deferred to the Board's remedial preferences where such preferences potentially trench upon federal statutes and policies unrelated to the NLRA." *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 144 (2002).

Section 7 effectuated Congress's intent to equalize bargaining power between employees and employers "by allowing employees to band together in confronting an employer regarding the terms and conditions of their employment," and that "[t]here is no indication that Congress intended to limit this protection to situations in which an employee's activity and that of his fellow employees combine with one another in any particular way." *City Disposal*, 465 U.S. at 835. On the other hand, no court decision prior to the Board's ruling under review today had held that the Section 7 right to engage in "concerted activities for the purpose of . . . other mutual aid or protection" prohibited class action waivers in arbitration agreements.

Board precedent and some circuit courts have held that the provision protects collective-suit filings. "It is well settled that the filing of a civil action by employees is protected activity . . . [and] by joining together to file the lawsuit [the employees] engaged in concerted activity." *127 Rest. Corp.*, 331 N.L.R.B. 269, 275-76 (2000). "[A] lawsuit filed in good faith by a group of employees to achieve more favorable terms or conditions of employment *is* 'concerted activity' under Section 7" of the NLRA. *Brady v. Nat'l Football League*, 644 F.3d 661, 673 (8th Cir. 2011). An employee's participation in a collective-bargaining agreement's grievance procedure on behalf of himself and other employees is similarly protected. *City Disposal*, 465 U.S. at 831-32, 835-36.

These cases under the NLRA give some support to the Board's analysis

that collective and class claims, whether in lawsuits or in arbitration, are protected by Section 7. To stop here, though, is to make the NLRA the only relevant authority. The Federal Arbitration Act ("FAA") has equal importance in our review. Caselaw under the FAA points us in a different direction than the course taken by the Board. As an initial matter, arbitration has been deemed not to deny a party any statutory right. *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 627 (1985). Courts repeatedly have rejected litigants' attempts to assert a statutory right that cannot be effectively vindicated through arbitration.[8] To be clear, the Board did not say otherwise. It said the NLRA invalidates any bar to *class* arbitrations.

The use of class action procedures, though, is not a substantive right. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 612-13 (1997); *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 332 (1980) ("[T]he right of a litigant to employ Rule 23 is a procedural right only, ancillary to the litigation of substantive claims."). This court similarly has "characterized a class action as 'a procedural device.'" *Reed v. Fla. Metro. Univ., Inc.*, 681 F.3d 630, 643 (5th Cir. 2012), *abrogated on other grounds by Oxford Health Plans LLC v. Sutter*, 133 S. Ct. 2064 (2013) (quoting *Blaz v. Belfer*, 368 F.3d 501, 505 (5th Cir. 2004)). "Thus, while a class action may lead to certain types of remedies or relief, a class action is not *itself*

---

[8] "In every case the Supreme Court has considered involving a statutory right that does not explicitly preclude arbitration, it has upheld the application of the FAA." *Walton v. Rose Mobile Homes LLC*, 298 F.3d 470, 474 (5th Cir. 2002) (citing cases); *see also CompuCredit v. Greenwood*, 132 S. Ct. 665, 673 (2012) (considering in the context of the Credit Repair Organization Act)).

Although the Board is correct that none of those cases considered a Section 7 right to pursue legal claims concertedly, they nevertheless emphasize the barrier any statute faces before it will displace the FAA. The Board presents no cases that have overcome that barrier, and our research reveals very limited exceptions. *See In re Nat'l Gypsum Co.*, 118 F.3d 1056, 1069 (5th Cir. 1997) (finding exception to mandatory arbitration necessary to preserve Bankruptcy Code's purpose of creating centralized and efficient bankruptcy court system); *Clary v. Helen of Troy, L.P.*, No. EP-11-CV-284-KC, 2011 WL 6960820, at *7 (W.D. Tex. Dec. 20, 2011) (finding inherent conflict between Jury Act and FAA).

a remedy." *Id.* The Board distinguished such caselaw on the basis that the NLRA is essentially *sui generis.* That act's fundamental precept is the right for employees to act collectively. Thus, Rule 23 is not the source of the right to the relevant collective actions. The NLRA is.

Even so, there are numerous decisions holding that there is no right to use class procedures under various employment-related statutory frameworks. For example, the Supreme Court has determined that there is no substantive right to class procedures under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"), despite the statute providing for class procedures. *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 32 (1991). Similarly, numerous courts have held that there is no substantive right to proceed collectively under the FLSA, the statute under which Cuda originally brought suit. *Carter v. Countrywide Credit Indus., Inc.*, 362 F.3d 294, 298 (5th Cir. 2004); *see also Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 506 (4th Cir. 2002); *Kuehner v. Dickinson & Co.*, 84 F.3d 316, 319-20 (9th Cir. 1996).

The Board determined that invalidating restrictions on class or collective actions would not conflict with the FAA. The Board reached this conclusion by first observing that when private contracts interfere with the functions of the NLRA, the NLRA prevails. The Board then noted that the FAA was intended to prevent courts from treating arbitration agreements less favorably than other private contracts, but the FAA allows for the non-enforcement of arbitration agreements on any "grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. It then reasoned that "[t]o find that an arbitration agreement must yield to the NLRA is to treat it no worse than any other private contract that conflicts with Federal labor law." The Board argues that any employee-employer contract prohibiting collective action fails under Section 7, and arbitration agreements are treated no worse and no better.

In so finding, the Board relied in part on its view that the policy behind

17

No. 12-60031

the NLRA trumped the different policy considerations in the FAA that supported enforcement of arbitration agreements. The Board considered its holding to be a limited one, remarking that the only agreements affected by its decision were those between employers and employees. The Board recognized that "a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 684 (2010). Even so, the Board concluded that it was not requiring parties to engage in class arbitration: "So long as the employer leaves open a judicial forum for class and collective claims, employees' NLRA rights are preserved without requiring the availability of class-wide arbitration," and "[e]mployers remain[ed] free to insist that *arbitral* proceedings be conducted on an individual basis."

The Board explained its interpretation of the NLRA as appropriately weighing the public policy interests involved and, to the extent the NLRA and FAA might conflict, suitably accommodating those statutes' interests. Had it found the two enactments to conflict, the Board believed the FAA would have to yield for also being in conflict with the Norris-LaGuardia Act of 1932, which prohibits agreements that prevent aiding by lawful means a person participating in a lawsuit arising out of a labor dispute, and which was passed seven years after the FAA.

We now evaluate the Board's reasoning. We start with the requirement under the FAA that arbitration agreements must be enforced according to their terms. *CompuCredit*, 132 S. Ct. at 669. Two exceptions to this rule are at issue here: (1) an arbitration agreement may be invalidated on any ground that would invalidate a contract under the FAA's "saving clause," *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1746 (2011); and (2) application of the FAA may be precluded by another statute's contrary congressional command, *CompuCredit*, 132 S. Ct. at 669.

18

No. 12-60031

The Board clearly relied on the FAA's saving clause. Less clear is whether the Board also asserted that a contrary congressional command is present. We consider each exception.

The first exception to enforcing arbitration agreements is set out in this language found in the FAA, which we will refer to as the "saving clause":

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, *save upon such grounds as exist at law or in equity for the revocation of any contract.*

9 U.S.C. § 2 (emphasis added).

The Board found that the Mutual Arbitration Agreement violated the collective action provisions of the NLRA, making the saving clause applicable. A detailed analysis of *Concepcion* leads to the conclusion that the Board's rule does not fit within the FAA's saving clause. A California statute prohibited class action waivers in arbitration agreements. *Concepcion,* 131 S. Ct. at 1746, 1753. The Court considered whether the fact that California's prohibition on class-action waivers applied in both judicial and arbitral proceedings meant the prohibition fell within the FAA's saving clause. *Id.* at 1746. The Court said the saving clause was inapplicable. "The overarching purpose of the FAA . . . is to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings," and "[r]equiring the availability of classwide arbitration interferes with fundamental attributes of arbitration and thus creates a scheme inconsistent with the FAA." *Id.* at 1748. The Court found numerous differences between class arbitration and traditional arbitration. These included that "the switch from bilateral to class arbitration sacrifices the principal advantage of arbitration – its informality – and makes the process slower, more costly, and more likely to generate procedural morass than final judgment." *Id.* at 1751. Class arbitration also "*requires* procedural

19

No. 12-60031

formality" because "[i]f procedures are too informal, absent class members would not be bound by the arbitration." *Id.* Finally, class arbitration "greatly increases risks to defendants" by removing "multilayered review," resulting in defendants, who might have been willing to accept such risks in individual arbitrations as the cost of doing business, being "pressured into settling questionable claims." *Id.* at 1752. Taken together, the effect of requiring the availability of class procedures was to give companies less incentive to resolve claims on an individual basis. *Id.* at 1750.

Like the statute in *Concepcion*, the Board's interpretation prohibits class-action waivers. While the Board's interpretation is facially neutral – requiring only that employees have access to collective procedures in an arbitral or judicial forum – the effect of this interpretation is to disfavor arbitration. As the *Concepcion* Court remarked, "there is little incentive for lawyers to arbitrate on behalf of individuals when they may do so for a class and reap far higher fees in the process. And faced with inevitable class arbitration, companies would have less incentive to continue resolving potentially duplicative claims on an individual basis." *Id.*

It is no defense to say there would not be any class arbitration because employees could only seek class relief in court. Regardless of whether employees resorted to class procedures in an arbitral or in a judicial forum, employers would be discouraged from using individual arbitration. Further, as *Concepcion* makes clear, certain procedures are a practical necessity in class arbitration. *Id.* at 1751 (listing adequate representation of absent class members, notice, opportunity to be heard, and right to opt-out). Those procedures are also part of class actions in court. As *Concepcion* held as to classwide arbitration, requiring the availability of class actions "interferes with fundamental attributes of arbitration and thus creates a scheme inconsistent with the FAA." *Id.* at 1748. Requiring a class mechanism is an actual impediment to arbitration and

violates the FAA. The saving clause is not a basis for invalidating the waiver of class procedures in the arbitration agreement.

We examine next whether the NLRA contains a congressional command to override the FAA. The FAA establishes "a liberal federal policy favoring arbitration agreements." *Id.* at 1749. The FAA's purpose is "to ensure the enforcement of arbitrations agreements according to their terms." *Id.* at 1748. "That is the case even when the claims at issue are federal statutory claims, unless the FAA's mandate has been 'overridden by a contrary congressional command.'" *CompuCredit*, 132 S. Ct. at 669 (quoting *Shearson/American Express Inc. v. McMahon*, 482 U.S. 220, 226 (1987)). If such a command exists, it "will be discoverable in the text," the statute's "legislative history," or "an 'inherent conflict' between arbitration and the [statute's] underlying purposes." *Gilmer*, 500 U.S. at 26. "[T]he relevant inquiry [remains] whether Congress . . . precluded 'arbitration or other nonjudicial resolution' of claims." *Garrett v. Circuit City Stores, Inc.*, 449 F.3d 672, 679 (5th Cir. 2006) (quoting *Gilmer*, 500 U.S. at 28).

When considering whether a contrary congressional command is present, courts must remember "that questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration." *Gilmer*, 500 U.S. at 26 (quotation marks and citation omitted). The party opposing arbitration bears the burden of showing whether a congressional command exists. *Id.* Any doubts are resolved in favor of arbitration. *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24-25 (1983).

There is no argument that the NLRA's text contains explicit language of a congressional intent to override the FAA. Instead, it is the general thrust of the NLRA – how it operates, its goal of equalizing bargaining power – from which the command potentially is found. For example, one of the NLRA's purposes is to "protect[] the exercise by workers of full freedom of association . . .

No. 12-60031

for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection." 29 U.S.C. § 151. Such general language is an insufficient congressional command, as much more explicit language has been rejected in the past. Indeed, the text does not even mention arbitration. By comparison, statutory references to causes of action, filings in court, or allowing suits all have been found insufficient to infer a congressional command against application of the FAA. *See CompuCredit*, 132 S. Ct. at 670-71. Even explicit procedures for collective actions will not override the FAA. *See Gilmer*, 500 U.S. at 32 (ADEA); *Carter*, 362 F.3d at 298 (FLSA). The NLRA does not explicitly provide for such a collective action, much less the procedures such an action would employ.[9] 29 U.S.C. § 157. Thus, there is no basis on which to find that the text of the NLRA supports a congressional command to override the FAA.

We next look for evidence in legislative history of a disavowal of arbitration. We find none. As amicus Chamber of Commerce observes, the legislative history of the NLRA, and its predecessor, the National Industrial Recovery Act of 1933, only supports a congressional intent to "level the playing field" between workers and employers by empowering unions to engage in collective bargaining. The Chamber of Commerce draws attention to the fact that Congress did not discuss the right to file class or consolidated claims against employers, although such a discussion would admittedly have occurred prior to the existence of Rule 23 or the FLSA. Therefore, the legislative history also does not provide a basis for a congressional command to override the FAA.

Neither the NLRA's statutory text nor its legislative history contains a congressional command against application of the FAA. Therefore, the Mutual

---

[9] Also relevant is that there is no private cause of action against employers to prevent and remedy unfair labor practices under the NLRA; enforcement is left, instead, to the Board. *See Hobbs v. Hawkins*, 968 F.2d 471, 478-79 (5th Cir. 1992). Accordingly, outside of the Board taking action, there would be no conflict between, for example, an employee's FLSA claim and the FAA.

No. 12-60031

Arbitration Agreement should be enforced according to its terms unless a contrary congressional command can be inferred from an inherent conflict between the FAA and the NLRA's purpose. *See Gilmer*, 500 U.S. at 26. As explained below, we do not find such a conflict.

First, courts repeatedly have understood the NLRA to permit and require arbitration. *See 14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 257-58 (2009) (finding that a collective-bargaining agreement's arbitration provision must be honored unless ADEA removes such claims from NLRA's scope); *Blessing v. Freestone*, 520 U.S. 329, 343 (1997) ("[W]e discern[] in the structure of the [NLRA] the very specific right of employees to complete the collective-bargaining process and agree to an arbitration clause." (internal quotation marks and citation omitted)); *Richmond Tank Car Co. v. NLRB*, 721 F.2d 499, 501 (5th Cir. 1983) (holding that NLRA's policy favors arbitration of labor disputes). As the Board itself acknowledged, "arbitration has become a central pillar of Federal labor relations policy and in many different contexts the Board defers to the arbitration process both before and after the arbitrator issues an award." Having worked in tandem with arbitration agreements in the past, the NLRA has no inherent conflict with the FAA.

Second, there are conceptual problems with finding the NLRA in conflict with the FAA. We know that the right to proceed collectively cannot protect vindication of employees' statutory rights under the ADEA or FLSA because a substantive right to proceed collectively has been foreclosed by prior decisions. *See Gilmer*, 500 U.S. at 32 (ADEA); *Carter*, 362 F.3d at 298 (FLSA). The right to collective action also cannot be successfully defended on the policy ground that it provides employees with greater bargaining power. "Mere inequality in bargaining power . . . is not a sufficient reason to hold that arbitration agreements are never enforceable in the employment context." *Gilmer*, 500 U.S. at 33. The end result is that the Board's decision creates either a right that is

hollow or one premised on an already-rejected justification.

We find no clear answer to the validity of the Board's use of the NLRA and FAA's respective enactment dates. Where statutes irreconcilably conflict, the statute later in time will prevail. *See Chi. & N. W. Ry. Co. v. United Transp. Union*, 402 U.S. 570, 582 n.18 (1971); *see also Lockhart v. United States*, 546 U.S. 142, 148 (2005) (Scalia, J., concurring). The Board determined that the NLRA was the later statute. The FAA was enacted in 1925, then reenacted on July 30, 1947. The NLRA was enacted on July 5, 1935, and reenacted on June 23, 1947. The reenactments were part of a recodification of federal statutes that apparently made no substantive changes. An Act to codify and enact into positive law, Title 9 of the United States Code, entitled "Arbitration", Pub. L. No. 80-282, 61 Stat. 669 (1947). The relevance of the date of enactment is whether a repeal by implication arises. *S. Scrap Material Co., LLC., v. ABC Ins. Co. (In re Southern Scrap Materials Co., LLC.)*, 541 F.3d 584, 593 n.14 (5th Cir. 2008). The implication is based on the assumption that Congress is fully aware of prior enactments as it adopts new laws. *Id.* It is unclear whether that assumption has the same force for a recodification.

Of some importance is that the NLRA was enacted and reenacted prior to the advent in 1966 of modern class action practice. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 832-33 (1999). We find limited force to the argument that there is an inherent conflict between the FAA and NLRA when the NLRA would have to be protecting a right of access to a procedure that did not exist when the NLRA was (re)enacted.[10] The dates of enactment have no impact on our decision.

---

[10] The Board also relied on the Norris-LaGuardia Act ("NLGA") to support its view that the FAA must give way to the NLRA. It is undisputed that the NLGA is outside the Board's interpretive ambit. *See Lechmere*, 502 U.S. at 536. We also conclude that the Board's reasoning drawn from the NLGA is unpersuasive.

No. 12-60031

The NLRA should not be understood to contain a congressional command overriding application of the FAA. The burden is with the party opposing arbitration, *Gilmer*, 500 U.S. at 26, and here the Board has not shown that the NLRA's language, legislative history, or purpose support finding the necessary congressional command. Because the Board's interpretation does not fall within the FAA's "saving clause," and because the NLRA does not contain a congressional command exempting the statute from application of the FAA, the Mutual Arbitration Agreement must be enforced according to its terms.

We do not deny the force of the Board's efforts to distinguish the NLRA from all other statutes that have been found to give way to requirements of arbitration. The issue here is narrow: do the rights of collective action embodied in this labor statute make it distinguishable from cases which hold that arbitration must be individual arbitration? *See Concepcion*, 131 S.Ct. at 1750-53. We have explained the general reasoning that indicates the answer is "no." We add that we are loath to create a circuit split. Every one of our sister circuits to consider the issue has either suggested or expressly stated that they would not defer to the NLRB's rationale, and held arbitration agreements containing class waivers enforceable. *See Richards v. Ernst & Young, LLP*, – F.3d — , No. 11-17530, 2013 WL 4437601, at *2 (9th Cir. Aug. 21, 2013); *Sutherland v. Ernst & Young LLP*, 726 F.3d 290, 297-98 n.8 (2d Cir. 2013); *Owen v. Bristol Care, Inc.*, 702 F.3d 1050, 1055 (8th Cir. 2013).[11]

*IV. Mutual Arbitration Agreement's Violation of NLRA Section 8(a)(1)*

The ALJ found that the Mutual Arbitration Agreement violated Section

---

[11] A thorough explanation of the strongest arguments in favor of the Board's decision, which embraces the Board's distinctions from earlier Supreme Court pronouncements on arbitrations and adding some of its own, appears in a recent law review article. Charles A. Sullivan & Timothy P. Glynn, Horton *Hatches the Egg: Concerted Action Includes Concerted Dispute Resolution*, 64 ALA. L. REV. 1013 (2013). We do not adopt its reasoning but note our consideration of its advocacy.

8(a)(1) and (4) for including language that would lead employees to a reasonable belief that they were prohibited from filing unfair labor practice charges. The ALJ reached this conclusion by analyzing the Board's decisions in *Bill's Electric, Inc.*, 350 N.L.R.B. 292 (2007) and *U-Haul Co. of California*, 347 N.L.R.B. 375 (2006), *enforced* 255 F. App'x 527 (D.C. Cir. 2007), both of which found broad and ambiguous judicial waivers unlawful. The Board affirmed the ALJ's Section 8(a)(1) holding on the same grounds.[12] The Board also relied on language in the agreement that all disputes would be resolved by arbitration, without listing any exception for unfair labor practice charges, and that employees waived the right to file a "lawsuit or other civil proceeding."

The arbitration agreement would violate the NLRA if it prohibited employees from filing unfair labor practice claims with the Board. Even "in the absence of express language prohibiting section 7 activity, a company nonetheless violates section 8(a)(1) if 'employees would reasonably construe the language to prohibit section 7 activity.'" *Cintas Corp. v. NLRB*, 482 F.3d 463, 467 (D.C. Cir. 2007) (citation omitted).

The agreement clearly provides that employees agree to arbitrate "without limitation[:] claims for discrimination or harassment; wages, benefits, or other compensation; breach of any express or implied contract; [and] violation of public policy." It also provides for four exceptions to arbitrations. None of these exclusions refer to unfair labor practice claims.

Horton emphasizes that the agreement refers to "court actions" and "rights to trial in court before a judge or jury," implying that administrative proceedings before the Board are unaffected. The agreement gives different indications too, as it provides that an "arbitrator will not have the authority to order any remedy that a court *or agency* would not be authorized to order." (emphasis added). The

---

[12] Because the Board affirmed the ALJ's holding under Section 8(a)(1), it did not reach Section 8(a)(4).

agreement also states that each party shall pay costs "that each party would incur if the claim(s) were litigated in a court *or agency*" and that "[t]he arbitrator may award reasonable fees and costs . . . to the prevailing party to the same extent a court *or agency* would be entitled to do." (emphases added).

Most importantly, the Mutual Arbitration Agreement concludes with an employee's acknowledgment that he or she "knowingly and voluntarily waiv[es] the right to file a lawsuit *or other civil proceeding* relating to Employee's employment with [Horton] *as well as* the right to resolve employment-related disputes in a proceeding before a judge or jury." (emphases added). The reasonable impression could be created that an employee is waiving not just his trial rights, but his administrative rights as well.

The ALJ and the Board cite some Board precedents that assist in our analysis. In one, the employer changed an application form to include a requirement that applicants resolve through grievance and arbitration procedures "any legal claims . . . in connection with [the applicant's] rights under Federal or State law." *Bill's Electric*, 350 N.L.R.B. at 295-96 (omission in original). An accompanying alternate dispute resolution form was entitled "Arbitration to be Exclusive Procedure for Resolution of All Disputes." *Id.* at 296. While that form also stated that it did not constitute a waiver of an employee's right to file a charge with the Board, this was not enough to save it: "At the very least, the mandatory grievance and arbitration policy would reasonably be read by affected applicants and employees as substantially restricting, if not totally prohibiting, their access to the Board's processes." *Id.*

Another Board decision invalidated an arbitration agreement that provided for arbitration of "any other legal or equitable claims and causes of action recognized by local, state, or federal law or regulations." *U-Haul,* 347 N.L.R.B. at 377. The Board "recognize[d] that the language in the arbitration policy [did] not explicitly restrict employees from resorting to the Board's

remedial procedures" but that "the breadth of the policy language" would result in employees "reasonably constru[ing] the remedies for violations of the [NLRA] as included among the legal claims . . . covered by the policy." *Id.* The panel rejected the argument that the phrase "court of law" cured the agreement's deficiencies because decisions by the Board could always be appealed to a United States court of appeals. *Id.* at 377-78.

As in *U-Haul*, the Mutual Arbitration Agreement refers to "court," "judge," and "jury," but these references are insufficient to counter the breadth of the waiver created by the phrase "right to file a lawsuit or other civil proceeding." Further, as in *Bill's Electric*, the agreement's use of seemingly incompatible language that refers to court actions in one sentence and agency actions in another, means an employee would reasonably read the agreement as also precluding unfair labor practice charges. Horton distinguishes *Bill's Electric* and *U-Haul* as occurring in the context of union activity, but neither opinion's reasoning was premised on such activity. The Board's finding that the Mutual Arbitration Agreement could be misconstrued was reasonable and the need for Horton to take the ordered corrective action was valid.

*IV. Conclusion*

All outstanding motions are DENIED. Horton's petition for review of the Board's decision invalidating the Mutual Arbitration Agreement's waiver of class procedures is GRANTED. The Board's order that Section 8(a)(1) has been violated because an employee would reasonably interpret the Mutual Arbitration Agreement as prohibiting the filing of a claim with the Board, is ENFORCED.

No. 12-60031

GRAVES, Circuit Judge, concurring in part and dissenting in part.

Because I would deny the petition for review, thus affirming the Board's decision in toto, I respectfully concur in part and dissent in part. Specifically, I disagree with the majority's finding that the Board's interpretation of sections 7 & 8(a)(1) of the National Labor Relations Act (NLRA) conflict with the Federal Arbitration Act (FAA).

The Mutual Arbitration Agreement (MAA) precludes employees from filing joint, class or collective claims in any forum. I agree with the Board that the MAA interferes with the exercise of employees' substantive rights under Section 7 of the NLRA, which provides, in relevant part, that employees have the right "to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ." 29 U.S.C. § 157.

Further, as the Board specifically found, holding that the MAA violates the NLRA does not conflict with the FAA for several reasons: (1) "the purpose of the FAA was to prevent courts from treating arbitration agreements less favorably than other private contracts." *In re D.R. Horton, Inc.*, 357 N.L.R.B. No. 184, *11 (2012). "To find that an arbitration agreement must yield to the NLRA is to treat it no worse than any other private contract that conflicts with Federal labor law." *Id*.; (2) "the Supreme Court's jurisprudence under the FAA, permitting enforcement of agreements to arbitrate federal statutory claims, including employment claims, makes clear that the agreement may not require a party to 'forgo the substantive rights afforded by the statute.'" *Id*. at *12. "The right to engage in collective action – including collective *legal* action – is the core substantive right protected by the NLRA and is the foundation on which the Act and Federal labor policy rest." *Id*. (emphasis original); (3) "nothing in the text of the FAA suggests that an arbitration

29

agreement that is inconsistent with the NLRA is nevertheless enforceable." *Id*. at *14. "To the contrary, Section 2 of the FAA . . . provides that arbitration agreements may be invalidated in whole or in part upon any 'grounds as exist at law or in equity for the revocation of any contract.'" *Id*.; and (4) "even if there were a direct conflict between the NLRA and the FAA, there are strong indications that the FAA would have to yield under the terms of the Norris-LaGuardia Act." *Id*. at *16.

I also agree with the Board's holding that Horton "violated Section 8(a)(1) by requiring employees to waive their right to collectively pursue employment-related claims in all forums, arbitral and judicial." *Id*. at *17. The Board made it clear that it was not mandating class arbitration in order to protect employees' rights under the NLRA, but rather was holding that employers may not compel employees to waive their NLRA right to collectively pursue litigation of employment claims in all forums, judicial and arbitral.

As acknowledged by the majority, we give the Board judicial deference in interpreting an ambiguous provision of a statute that it administers. *Lechmere, Inc. v. NLRB*, 502 U.S. 527, 536 (1992). Further, as acknowledged by the majority, there is authority to support the Board's analysis.

For the reasons set out herein, I would deny the petition for review and affirm the Board's decision in toto. Therefore, I respectfully concur in part and dissent in part.