# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
June 9, 2026

Lyle W. Cayce
Clerk

No. 25-40237

EnvTech, Incorporated,

*Plaintiff—Appellant*,

*versus*

Patrick Andrew DeBusk,

*Defendant—Appellee*.

———————————————————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 3:24-CV-71

———————————————————

Before Southwick, Higginson, and Douglas, *Circuit Judges*.

Dana M. Douglas, *Circuit Judge*:

EnvTech, Inc. ("EnvTech") sued Patrick DeBusk, the CEO and founder of USA DeBusk LLC ("USAD"), alleging that he directed and conspired with USAD employees to steal EnvTech's proprietary one-step chemical formula and cleaning process for hydrofluoric acid alkylation ("HF alky") units in oil refineries. EnvTech brought its claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), alleging that this theft was part of a broader pattern of trade secret theft whereby USAD regularly hires competitors' key employees and steals their proprietary knowledge at DeBusk's direction. The district court dismissed EnvTech's

No. 25-40237

complaint, as amended, pursuant to Federal Rule of Civil Procedure 12(b)(6) on grounds that it had not plausibly pleaded that DeBusk personally committed trade secret theft with the requisite mental state or alleged a pattern of racketeering activity.

We hold that EnvTech has plausibly alleged that DeBusk engaged in a pattern of trade secret theft in violation of the RICO statute. We therefore REVERSE and REMAND.[1]

## I

## A

The facts alleged by EnvTech are as follows: EnvTech has been the world's premier provider of cleaning products and services for HF alky units for over twenty years.[2] It developed a confidential and proprietary formula and technique for performing neutral pH chelation chemical cleanings of HF

-----

[1] EnvTech filed a motion for judicial notice in this case with respect to a Texas state court jury verdict it obtained against USAD and former EnvTech minority owner Paul Taylor for civil trade secret misappropriation shortly after the district court granted DeBusk's motion to dismiss the amended complaint. DeBusk opposed, arguing that this would impermissibly supplement the record on appeal. DeBusk also contended that any references to the verdict should be stricken from EnvTech's opening brief. DeBusk argues that the verdict is irrelevant because it involved a different claim against different defendants, and that EnvTech could have moved for reconsideration in the district court under Federal Rule of Civil Procedure 59(e) given that the verdict came shortly after DeBusk's motion to dismiss was allowed. EnvTech replied, arguing that the verdict is an admissible adjudicative fact not subject to reasonable dispute. Because judicial notice of the verdict would not change the outcome here, we DENY the motion for judicial notice. *See Bd. of Miss. Levee Comm'rs v. U.S. E.P.A.*, 674 F.3d 409, 417 n.4 (5th Cir. 2012) (noting authority to supplement appellate record, but declining to do so where "unnecessary to resolve the issues on appeal"); *U.S. ex rel. Jamison v. Del-Jen, Inc.*, 747 F. App'x 216, 219 (5th Cir. 2018) (per curiam) ("[T]he fact that [a document] was not attached to the complaint means that it has no bearing on the issue of whether [a] theory [in the complaint] was adequately pleaded.").

[2] HF alky units are used in oil refineries to produce high-octane gasoline.

alky units that is safer, more efficient, faster, and more environmentally friendly than the alternatives, and that it claims is a trade secret. EnvTech was the only provider of neutral pH chelation chemical cleaning products and services for HF alky units in oil refineries until USAD began to offer similar cleanings in 2021. For the twenty-year period ending in 2021, EnvTech estimates that it controlled approximately 80% of the western market for neutralizing and cleaning HF alky units.

DeBusk is the founder, chairman, and CEO of USAD, which provides industrial cleaning services. DeBusk's alleged non-party co-conspirators Paul Rowland Taylor II and Richard V. Rutherford each worked for EnvTech for more than ten years before they were hired by USAD, and alleged non-party conspirator Dudley Hughes is the Vice President of Technical Sales for USAD.

B

Taylor, who is a former minority owner of EnvTech, left EnvTech to work for USAD in 2012. At that time, USAD had experience performing traditional HCl-based cleaning of HF alky units, but not the kind of neutral pH chelation chemical cleaning that EnvTech performed. Taylor was privy to the exact components and ratios of EnvTech's confidential and proprietary chemical blends and the methods of its cleaning process. EnvTech considers its chemical blends so confidential that it does not reduce them to writing; they are only disclosed to company owners and, with accompanying confidentiality and non-disclosure agreements, to a handful of employees who prepare and implement the blends. Taylor owed a duty of confidentiality and non-disclosure to EnvTech, and Rutherford had a written agreement with EnvTech not to use its confidential and proprietary information.

Around the middle of 2019, Taylor sought to convince DeBusk to allow USAD to pursue whole unit cleanings of HF alky units, including neutral pH chelation chemical cleanings. On June 3, 2019, Taylor e-mailed a department manager to propose "go[ing] after the HF Alky Unit business" and, after receiving a favorable response, stated that to do so would "require a team effort, especially to get [DeBusk] very interested" due to his two prior bad experiences with HCl-based cleanings of HF alky units. Taylor proposed setting up a meeting with himself and Rutherford, who at the time was not employed by USAD. Taylor forwarded this e-mail conversation to Hughes, noting that he was "avoiding sending anything directly to [DeBusk]" and that he "wouldn't attempt to go after alky units without someone like [Rutherford]."

On July 1, 2019, Taylor e-mailed DeBusk directly to suggest "developing an HF Alky unit group." DeBusk responded, telling Taylor he would get back to him that day. On July 3, 2019, Taylor sent what EnvTech calls the "smoking gun" e-mail to Hughes, proposing a meeting with EnvTech's former employee Rutherford, who, he explained, had "spent the past 9 years cleaning alky units all over the world." Taylor stated that he "kn[ew] the EnvTech chemistry and helped to develop it," but "would not attempt to clean any alky units without [Rutherford's] level of expertise and assistance," and reiterated that DeBusk's prior experience made DeBusk "nervous as hell" about alky units.

On August 28, 2019, in response to a request for general information regarding HF alky unit cleaning, Taylor e-mailed Hughes and attached a description of a "generic procedure" for cleaning HF alky units, which was an EnvTech document with all but one reference to EnvTech replaced with "USAD." Taylor replaced this reference to EnvTech in a "corrected" document he circulated shortly after, stating that he had not edited the initial

document "correctly." Taylor again reiterated that he would not want to attempt whole-unit cleanings without someone like Rutherford on board.

On September 26, 2019, Taylor e-mailed DeBusk and Hughes, attaching a "Unit Clearing Summary" that summarized USAD's pending bids for whole unit refinery cleanings, explaining that an upcoming bid opportunity was "[i]ronically . . . an alky unit," and thanking DeBusk for his "push" to get USAD's Unit Clearing group "on board with the safety program." On November 18, 2019, Hughes informed DeBusk that he was working on setting up a meeting at a PBF Energy refinery in Torrance, California ("PBF Torrance") to obtain HF alky unit cleaning work. Around the same time, Taylor asked Rutherford to send documents and information about EnvTech's neutral pH chelation chemical cleaning method, and Rutherford began sending the information despite his confidentiality agreement.

By early January 2020, USAD had created safety data sheets for the chemical blends it would use to perform neutral pH chelation chemical cleanings of HF alky units. These sheets are required by HF alky unit owners and operators because the units are considered dangerous and are highly regulated. The data sheets for USAD's chelant solution and buffer include the same chemicals as EnvTech's, with "very similar ratios."

Also in January 2020, USAD retained Rutherford as a consultant to help it perform its first-ever neutral pH chelation chemical cleaning of an HF alky unit at PBF Torrance. In February 2020, DeBusk, Taylor, Rutherford, Hughes, and others attended an in-person meeting at PBF Torrance. At that meeting, USAD stated that it could perform the requested neutral pH chelation chemical cleaning and highlighted Taylor's and Rutherford's experience at EnvTech.

On February 27, 2020, Taylor forwarded an e-mail to DeBusk informing him that PBF Torrance wanted to retain USAD's services to clean its HF alky unit in 2021. Taylor stated, "Looks like it is one of those situations that you have to be careful what you ask for (if we don't want to do HF Alky units) . . . . If there is any turning back, now is the time to make that call." DeBusk replied, "Sweet."

USAD pursued more HF alky unit cleaning business, continuing to highlight Taylor and Rutherford's expertise. On May 4, 2020, Taylor noted in an internal USAD e-mail that DeBusk gave "a nice push" in a sales meeting "encouraging all of the sales guys to get [Taylor] in front of alky units and the odds will be in USAD's favor," and that roughly half of USAD's whole unit cleaning bids, worth millions of dollars, was related to alky units. In early May 2020, long-time EnvTech client Flint Hills Resources ("FHR") retained USAD to perform a neutral pH chelation chemical cleaning of an HF alky unit that EnvTech had previously cleaned several times. In a July 2020 e-mail on which DeBusk was copied, Taylor touted upcoming alky unit cleaning opportunities; DeBusk continued to encourage this progress.

On the morning of January 15, 2021, a USAD regional manager e-mailed Taylor, DeBusk, and others to encourage the development of an "Alky tracker" spreadsheet, which had been proposed by DeBusk in December 2020, and noted that DeBusk was "pushing very hard to be a top Alky contractor." That same day, EnvTech filed suit against USAD and Taylor in Texas state court for their roles in the alleged misappropriation of EnvTech's trade secret and obtained a temporary restraining order.

That evening, after USAD and Taylor were notified of the suit, the same USAD regional manager e-mailed Taylor, Rutherford, Hughes, and others to inform them of an upcoming call to talk about "Ph neutral HF Alky

Chemical Cleaning." He stated, "DeBusk has asked you to join the call" and "we need your help." He asked, "Also is there anyone outside the company that has done these type of cleanings and can state that what we are doing is not an industry secret?" One USAD employee responded that he had "personally used neutral to alkaline ph chelants during [his] time at [another company] on a hf alky unit." The regional manager replied, copying DeBusk, "if you have any old pals that can back you up, that's not an USAD employee, it would be great [to] add them to our claim." DeBusk replied to this e-mail, "This would be huge."[3]

EnvTech recites additional evidence from its January 2021 Texas state court trade secret misappropriation lawsuit against USAD and Taylor supporting the propositions that USAD was the only alternative to EnvTech for neutral pH chelation chemical cleanings of HF alky units in the relevant time period, and that USAD performed no testing or experimentation to verify the efficacy of its process. The complaint, as amended, also cites evidence that DeBusk relied on Hughes and Taylor when deciding "to allow USAD to use the knowledge and experience of Taylor and Rutherford with EnvTech's [HF alky unit cleaning method]," and that, as he stated in his state court deposition, DeBusk knew USAD used "some of the same chemistry or same technology that EnvTech uses or has used" to perform these cleanings. The complaint also provides that Taylor admitted in his state court deposition that he advertised USAD's ability to use a cleaning process similar to EnvTech's to potential clients, and that he was privy to

---

[3] In EnvTech's state court lawsuit, it alleges, USAD has not identified any non-USAD employees or witnesses unaffiliated with EnvTech who have performed neutral pH chelation chemical cleanings of HF alky units. EnvTech further alleges that the USAD employee who stated that he had previously used chelants to clean an HF alky unit admitted in his deposition that he used different chelants than those used by EnvTech. He further provided that unlike EnvTech, USAD did not use a buffer.

EnvTech's confidential information regarding HF alky unit cleaning, knew it to be confidential, and owed a duty of confidentiality and non-disclosure to EnvTech. Taylor testified that he created the chemical blends USAD used for these cleanings and provided that information for the data sheets.

EnvTech summarizes DeBusk's role in the theft of its trade secret in terms of his "direction, support, and approval": specifically, "DeBusk directed Taylor and Rutherford to steal and use without EnvTech's authorization EnvTech's confidential and proprietary cleaning process." This role is shown from the following: DeBusk's personally attending the USAD meeting at PBF Torrance where USAD secured its first neutral pH chelation chemical cleaning contract; Debusk's reliance on Hughes and Taylor when deciding to pursue this new line of business; and DeBusk's knowledge that USAD replaced EnvTech to perform the HF alky unit cleaning jobs at PBF Torrance and for FHR. On the last point, EnvTech alleges that "USAD was only capable of [replacing EnvTech] because it stole EnvTech's confidential and proprietary cleaning method through its employment of Taylor and Rutherford, and then used that secret information without EnvTech's authorization."

C

In support of its claim that DeBusk's theft of its trade secrets was part of a broader pattern of RICO violations, EnvTech repeats and supplements allegations from four other lawsuits brought by three other companies alleging trade secret misappropriation against USAD and, in one instance, DeBusk. EnvTech also alleges broadly that DeBusk's testimony that he "never thought about trade secrets" because USAD's business plan is "more about execution of hiring people" refers to USAD's illegal modus operandi of hiring its competitors' employees to steal their trade secrets.

No. 25-40237

## II

EnvTech filed suit against DeBusk in the Southern District of Texas on March 8, 2024, under 18 U.S.C. § 1964(c), claiming violations of the RICO statute, 18 U.S.C. § 1962(c) and (d), based on predicate acts of intentional theft of trade secrets or conspiracy to commit the same. DeBusk moved to dismiss under 12(b)(6) for failure to state a claim for relief. The district court granted the motion without prejudice on the grounds that the complaint did not plausibly allege that DeBusk himself personally agreed to or participated in trade secret theft with the requisite mens rea and did not plausibly allege a pattern of racketeering activity because EnvTech relied on "broad allegations only of trade-secret misappropriation" in lawsuits brought by USAD's competitors to allege a pattern.[4]

EnvTech filed an amended complaint, alleging more specifically that DeBusk was convinced by his co-conspirators Taylor, Rutherford, and Hughes to pursue neutral pH chelation chemical cleanings of HF alky units,

---

[4] Unlike the federal trade secret theft statute, which requires knowledge and intent, 18 U.S.C. § 1832(a), Texas and federal civil trade secret misappropriation law requires only that the person accused of misappropriating the trade secret "knows *or has reason to know* that the trade secret was acquired by improper means," Tex. Civ. Prac. & Rem. Code § 134A.002(3) (emphasis added); 18 U.S.C. §§ 1836, 1839(5)(A). It also reaches more general categories of "acquisition," "disclosure," and "use" of trade secrets. Tex. Civ. Prac. & Rem. Code § 134A.002(3)(B); 18 U.S.C. §§ 1836, 1839(5), (6)(A). 18 U.S.C. § 1832 criminalizes a more specific set of actions whereby "the defendant knowingly stole, copied, or received trade secret information." *United States v. Liu*, 716 F.3d 159, 169 (5th Cir. 2013); *see ESPOT, Inc. v. MyVue Media, LLC*, 492 F. Supp. 3d 672, 694–95 (E.D. Tex. 2020) (holding that plaintiff could not rely on allegations that defendants were "using its trade secrets, and will continue to do so, to establish an open-ended pattern of racketeering activity," because "the criminal statute is limited to the point in time that a trade secret falls into unauthorized hands," so each instance of trade secret *use* is not a separate criminal offense); *but see Brand Energy & Infrastructure Servs., Inc. v. Irex Contracting Grp.*, No. 16-2499, 2017 WL 1105648, at *12 (E.D. Pa. Mar. 24, 2017) (treating defendants' continued use of plaintiff's trade secrets as sufficient to support a RICO pattern, albeit where other crimes were also alleged).

9

and supporting its claim that DeBusk directed these co-conspirators to use EnvTech's trade secret by incorporating more evidence gleaned from its Texas state court lawsuit against Taylor and USAD. The amended complaint also added allegations of irregularities in USAD's practices around HF alky unit cleaning, including its declining to perform any testing or experimentation to verify the efficacy of its new cleaning process. The amended complaint also specifically advanced a theory of DeBusk's willful blindness with respect to USAD's use of Taylor and Rutherford's knowledge and experience at EnvTech. EnvTech also supplemented its allegations regarding the other, non-party lawsuits it relied on for its pattern allegations, attempting to highlight that those suits at least arguably encompassed allegations of trade secret theft and not just misappropriation. EnvTech alleged that "DeBusk's pattern of racketeering activity is demonstrated by his knowing involvement in USAD's efforts to obtain without authorization its competitors' trade secrets."

DeBusk again moved to dismiss. The district court granted the motion in a one-paragraph order concluding that "the amended complaint suffers from the same deficiencies as the original complaint," and denied EnvTech's request for leave to amend. The case was dismissed with prejudice on April 24, 2025.

III

We have jurisdiction to review final orders granting a motion to dismiss for failure to state a claim pursuant to 28 U.S.C. § 1291. *ANR Pipeline Co. v. La. Tax. Comm'n*, 646 F.3d 940, 946 (5th Cir. 2011). We review dismissals for failure to state a claim de novo, asking whether the plaintiff has pleaded "enough facts to state a claim to relief that is plausible on its face." *In re S. Scrap Material Co., LLC*, 541 F.3d 584, 587 (5th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although "conclusory

No. 25-40237

allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss," *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993), well-pleaded facts must be accepted as true and "view[ed] . . . in the light most favorable to the non-moving party," *In re S. Scrap Material*, 541 F.3d at 587, and "[w]e must also draw all reasonable inferences in the plaintiff's favor," *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009). "This standard 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of' the necessary claims or elements." *In re S. Scrap Material*, 541 F.3d at 587 (quoting *Twombly*, 550 U.S. at 556).

A

In 2016, Congress expanded the RICO statute to include trade secret theft as a RICO predicate act. Defend Trade Secrets Act of 2016, Pub. L. No. 114-153, § 3, 130 Stat. 376, 382 (2016); 18 U.S.C. § 1961(1)(B). EnvTech argues that it plausibly alleged that DeBusk committed trade secret theft as defined by three provisions of the federal trade secret statute, 18 U.S.C. § 1832(a). The provisions it invokes apply to:

> (a) Whoever, with intent to convert a trade secret, that is related to a product or service used or intended for use in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret, knowingly—
>
>> (1) steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains such information;
>>
>> . . .
>>
>> (3) receives, buys, or possesses such information, knowing the same to have been stolen or

11

> appropriated, obtained, or converted without authorization;
>
> . . . or
>
> (5) conspires with one or more other persons to commit any offense described in paragraphs (1) through (3), and one or more of such persons do any act to effect the object of the conspiracy[.]

18 U.S.C. § 1832(a).

As to theft and knowing receipt under § 1832(a)(1) and (3), EnvTech points to its allegation that DeBusk knowingly directed USAD to use Taylor and Rutherford's experience with EnvTech's trade secret to pursue and perform one-step neutral pH chelation chemical cleanings of HF alky units. EnvTech also points to its allegations supporting the inference that DeBusk knew or was willfully blind to the fact that this cleaning method was EnvTech's trade secret, such as his admitted awareness that USAD used some of the same technology as EnvTech. As to conspiracy under § 1832(a)(5), EnvTech points to its allegations that DeBusk's direction, support, and approval were required for USAD to pursue these cleanings, and, again, that he knew or was willfully blind to the fact that USAD was only able to perform these cleanings because Taylor and Rutherford used their knowledge of EnvTech's trade secret, as shown by, for instance, USAD's performing no testing or experimentation to assess this method.

Trade secret theft as defined by 18 U.S.C. § 1832 requires proof of five elements: "(1) that the defendant intended to convert proprietary information to the economic benefit of anyone other than the owner; (2) that the proprietary information was a trade secret; (3) that the defendant knowingly stole, copied, or received trade secret information; (4) that the defendant intended or knew the offense would injure the owner of the trade secret; and (5) that the trade secret was included in a product that is placed

in interstate commerce." *Liu*, 716 F.3d at 169–70. The parties focus their arguments on elements (1), (3), and (4).

Although 18 U.S.C. § 1832(a)(5)'s conspiracy provision incorporates the knowledge and intent requirements of § 1832(a), "the relevant inquiry in a conspiracy case . . . is whether the defendant entered into an agreement to steal, copy, or receive information that he *believed* to be a trade secret[.]" *Id.* at 170. To allege a conspiracy offense, EnvTech must plead "(1) an agreement existed between two or more persons to pursue an unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one or more of the members of the conspiracy in furtherance of the objective of the conspiracy." *United States v. Mauskar*, 557 F.3d 219, 229 (5th Cir. 2009) (quoting *United States v. Williams*, 507 F.3d 905, 910 n.4 (5th Cir. 2007)).

Contrary to the district court's ruling that it did not plead the requisite mens rea, we agree with EnvTech that it has plausibly alleged DeBusk committed trade secret theft and conspired to commit the same. The complaint plainly alleges that DeBusk directed USAD to obtain HF alky unit cleaning business, knowing that it was using Taylor's experience at EnvTech to do so and knowing that it replaced EnvTech for the PBF and FHR cleaning jobs. If EnvTech has plausibly pleaded that DeBusk knew its cleaning method was a trade secret and that Taylor was using his knowledge of it to obtain and conduct this business, then, the elements of intentional conversion, knowing theft or receipt, and intentional injury are satisfied.[5]

_____

[5] In other words, if it has plausibly pleaded DeBusk's *knowing* direction of his subordinates' alleged actions, EnvTech has pleaded that DeBusk personally participated in USAD's theft of EnvTech's trade secret. *See United States v. Amrep Corp.*, 560 F.2d 539, 545 (2d Cir. 1977) (holding individual corporate defendants criminally liable for fraud based on a showing "that the individual defendants were fully aware of the corporate activities found to be fraudulent and participated actively therein"); *United States v. Sherpix, Inc.*,

No. 25-40237

We find three categories of well-pleaded facts most persuasive in concluding that EnvTech's allegations cross the plausibility threshold. First, there is the evident rarity of EnvTech's trade secret, as shown by EnvTech's being the *only* purveyor of neutral pH chelation chemical cleaning products and services for HF alky units in oil refineries before USAD entered the business, and by its overwhelming market share. Second, there is DeBusk's status as founder, chairman, and CEO of USAD, and the specific facts, such as his personal involvement in hiring and acquiring new business, supporting an inference that he exercises extensive control over USAD. Third, there is DeBusk's specific involvement in USAD's campaign to secure HF alky unit cleaning business, including his awareness that USAD used some of EnvTech's technology and touted Taylor's EnvTech experience, particularly when set aside apparent irregularities such as USAD's declining to test its new cleaning method. Viewed in the light most favorable to EnvTech, these factual allegations support a reasonable inference that DeBusk knew about the source of the significant new revenue stream connected with Taylor and Rutherford's experience at EnvTech, and directed or conspired with them to steal it.

DeBusk argues that at least some of the above could be said about any corporate executive whose employees have committed trade secret theft or

---

512 F.2d 1361, 1372 (D.C. Cir. 1975) (similar, with respect to a conspiracy charge). Under the circumstances, EnvTech's reference to trade secret theft conspiracy under 18 U.S.C. § 1832(a)(5) does not require a separate analysis. "'[E]ach element [of a conspiracy] may be proven by circumstantial evidence,' and proof of a tacit conspiratorial agreement is sufficient." *Mauskar*, 557 F.3d at 229 (first alteration in original) (citations omitted) (quoting *United States v. Mulderig*, 120 F.3d 534, 547 (5th Cir. 1997)) (citing *United States v. Freeman*, 434 F.3d 369, 376 (5th Cir. 2005)). All EnvTech's allegations supporting the inference that DeBusk knew about and directed USAD's theft of EnvTech's trade secret also support the inference that DeBusk formed an agreement with others to commit trade secret theft. Of course, theft and conspiracy offenses have distinct elements and may be subject to separate challenge at later stages.

misappropriation.  We are not persuaded, however, that this concern should overcome the ordinary application of the pleading rules.  DeBusk cites no authority for the proposition that, because this is a RICO case bottomed on criminal offenses, we should apply any heightened pleading standard beyond the requirement that EnvTech plead facts supporting a reasonable inference of knowledge and intent.  *See Croswell v. Martinez*, 120 F.4th 177, 184–85 (5th Cir. 2024) (noting a concern that RICO claims should not be based on general or conclusory allegations, but declining to decide whether "a special elevated standard" applies to RICO claims).  EnvTech has met that requirement.

Nor are we persuaded by DeBusk's argument that the amended complaint must be dismissed because the facts alleged could be plausibly explained on the theory that DeBusk was no more than an ordinary executive urging expansion into a new market segment while Taylor, Hughes, and Rutherford perpetrated trade secret theft under his nose.  Even if we accepted that the facts EnvTech alleges were equally explainable on two different theories, DeBusk cites no authority for the proposition that a tie must go to the defendant, and the ordinary pleading rules counsel otherwise.  *See In re S. Scrap Material*, 541 F.3d at 587 ("We must accept all well-pleaded facts as true and view them in the light most favorable to the non-moving party"); 5B Wright & Miller's Federal Practice & Procedure § 1357 (4th ed. 2025) ("[T]he mere existence of an alternative explanation [does not] entitle[] a defendant to dismissal.  Rather, there must be a factual context that supports an inference of liability as one plausible explanation for what has been alleged."); *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) ("For cases governed only by [Federal] Rule [of Civil Procedure] 8, it is not necessary to stack up inferences side by side and allow the case to go forward only if the plaintiff's inferences seem more compelling than the opposing inferences.").  DeBusk's "ignorant-CEO"

theory is, to be sure, an alternative explanation; but, in light of the specific factual allegations described above, not an obvious one that cries out for explanation at the pleading stage.

EnvTech has plausibly alleged that DeBusk committed trade secret theft and conspired to commit the same. We proceed to analyze whether EnvTech has plausibly alleged a RICO pattern.

B

The RICO statute makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). It also makes it "unlawful for any person to conspire to violate any of the provisions of subsection . . . (c) of this section." *Id.* § 1962(d).[6] Both subsections require proof of three elements: "(1) a person who engages in (2) a pattern of racketeering activity, (3) connected to the acquisition, establishment, conduct, or control of an enterprise." *D&T Partners, L.L.C. v. Baymark Partners Mgmt., L.L.C.*, 98 F.4th 198, 204–05 (5th Cir. 2024) (quoting *Abraham v. Singh*, 480 F.3d 351, 355 (5th Cir. 2007)).

"A pattern, according to RICO, requires at least two predicate criminal actions." *Id.* at 205. These acts must be "related," that is, they must "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise [be] interrelated by distinguishing

---

[6] EnvTech initially alleged a RICO conspiracy under 18 U.S.C. § 1962(d), but dropped this issue on appeal. We therefore do not address it here.

characteristics and [not be] isolated events," and they must be continuous. *Id.* (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240 (1989)).

The district court held that EnvTech did not plausibly allege a pattern of racketeering activity because it pointed only to civil trade secret misappropriation suits that do not equate to federal trade secret theft. EnvTech argues that this was incorrect because DeBusk could be liable for trade secret theft based on the actions alleged in these misappropriation suits, particularly given that theft is one basis for a misappropriation suit under Texas law. *See* TEX. CIV. PRAC. & REM. CODE § 134A.002(2). DeBusk agrees with the district court, and points out the lack of allegations about DeBusk's personal actions in all four suits including Farr Front Chemical Services LLC's ("Farr Front"), which is the only one that names DeBusk individually.

i

The threshold pattern issue here is similar to the above—that is, whether EnvTech adequately pleads the requisite mens rea with respect to the alleged additional predicate offenses—with the added twist that EnvTech relies on four other lawsuits for its allegations of additional predicate offenses. This raises the additional question of whether EnvTech may rely on the allegations from these other lawsuits to support its own allegations. *See Word of Faith World Outreach Ctr. Church, Inc. v. Sawyer*, 90 F.3d 118, 124 (5th Cir. 1996) ("Pleading the mere existence of lawsuits is not the same as pleading the facts that demonstrate predicate illegal acts as the defendant's regular way of doing business."); *Attia v. Google LLC*, No. 17-cv-06037, 2018 WL 2971049, at *15 (N.D. Cal. June 13, 2018) (stating, where complaint "merely recite[d] the allegations and proceedings in six other lawsuits" without indicating that plaintiffs "personally investigate[d] their claims against Defendants," that "[i]t is not sufficient to merely plead the existence

of other trade secret lawsuits," and "[p]laintiffs must plead the underlying factual circumstances of each case"). Indeed, DeBusk argues strenuously that EnvTech merely parrots the allegations of plaintiffs in other cases, dodging its non-delegable duty to conduct its own investigation and plead its own facts. *See* FED. R. CIV. P. 11.

EnvTech bases its complaint on "personal knowledge as to its own actions and on information and belief as to all other matters," and some of EnvTech's allegations in relation to these other competitors' lawsuits are clearly adopted as its own. As to Refined Technologies, Inc. ("RTI"), EnvTech alleges generally that "RTI is the most recently identified victim of DeBusk's scheme to steal USAD's competitors' trade secrets by poaching their key employees who have knowledge of, and experience with, those trade secrets, for the financial benefit of USAD," and quotes paragraphs from RTI's complaint to argue that the allegations in this other suit at least arguably include theft. As to Farr Front, EnvTech specifically alleges that USAD hired Farr Front's key employees "as part of its scheme to gain illegal access to Farr Front's . . . trade secrets," and states that "DeBusk admitted at his deposition in [EnvTech's] Texas State Court Lawsuit that he was personally and directly involved in the hiring" of the two employees in question. It also alleges that one of the employees hired away from Farr Front "acted at DeBusk's direction and with DeBusk's express approval so USAD could steal and benefit from Farr Front's trade secrets." As to HydroChem LLC d/b/a HydroChem PSC ("HydroChem"), EnvTech refers more obliquely to a "pattern of alleged conduct" whereby Debusk was "personally involved in the hiring of both [HydroChem former employees] Martin and Warwick, induced them to violate their confidentiality and non-solicitation agreements with HydroChem, and used HydroChem's . . . trade secrets" to USAD's gain. It also refers again to DeBusk's deposition testimony, which "indicates that he has personal

knowledge of USAD's targeted recruitment of [HydroChem's employees]—and what they could illegally bring with them to USAD from HydroChem—because he testified he knew they left HydroChem given their dissatisfaction with HydroChem."

Unlike *Sawyer*, these allegations are specific enough to plead additional RICO predicate acts. EnvTech specifically alleges that DeBusk participated in the hiring of the employees who stole Farr Front's trade secret, and alleges generally that he directed one of them to do so. It alleges the same, albeit in more general terms, with respect to HydroChem, and, even as to RTI, it alleges that DeBusk personally hired a former RTI employee who was later accused by RTI of trade secret misappropriation in its lawsuit against USAD.[7] It supplements its allegations from other suits with its own independent allegations from its state court litigation against USAD and Taylor. Under the circumstances, to require more would be to require EnvTech to plead facts it cannot realistically know without discovery. *See Morgan v. Hubert*, 335 F. App'x 466, 472 (5th Cir. 2009) (declining to fault plaintiff for "failure of specificity" when "he has not yet had the benefit of discovery, and is bound by Rule 11 to allege only those facts for which he has or will likely have evidentiary support," and noting that "we do not require a plaintiff to plead facts 'peculiarly within the knowledge of defendants'" (quoting *Schultea v. Wood*, 47 F.3d 1427, 1432 (5th Cir. 1995))); *see also Paul v. Aviva Life & Annuity Co.*, No. 3:09-CV-1490, 2010 WL 5105925, at *10 (N.D. Tex. Dec. 14, 2020) (noting that, "[b]ecause conspiracies are often 'shrouded in mystery,' a plaintiff does not have to plead with specificity facts that are within the defendant's control" (quoting

_____

[7] Kyle Williams, one of the individual former employees sued by Farr Front, also previously worked for RTI, and was sued by RTI as part of its own suit against USAD, so the allegations underlying these two suits overlap.

*Adcock v. Brakegate, Ltd.*, 164 Ill.2d 54, 66 (1994))).  EnvTech must plead only "'enough fact to raise a reasonable expectation that discovery will reveal evidence of' the necessary claims or elements." *In re S. Scrap Material*, 541 F.3d at 587 (quoting *Twombly*, 550 U.S. at 556).  It has done so with respect to these other lawsuits.

In addition, EnvTech pleads facts with respect to each of these three other competitors that could plausibly support a trade secret theft or conspiracy claim against DeBusk.  The district court's emphasis on the lesser requirements of civil trade secret misappropriation lawsuits, while understandable, seems to have pushed it toward drawing the inference favorable to DeBusk that none of those other suits could support a claim of trade secret theft.  Theft, however, is one of the ways one can commit trade secret misappropriation under Texas and federal law, and each of the other competitors' lawsuits contains allegations that USAD stole their trade secrets, which EnvTech has supplemented with specific allegations regarding DeBusk's personal involvement in these schemes.  Tex. Civ. Prac. & Rem. Code § 134A.002(2); 18 U.S.C. §§ 1836, 1839(5), (6)(A).  Viewing the facts alleged in the light most favorable to EnvTech, we conclude that DeBusk's personal involvement in hiring employees implicated in these other competitors' lawsuits, along with his generally alleged direction of the theft of those competitors' trade secrets and the specific allegations regarding his role in USAD, could plausibly support trade secret theft or conspiracy claims.

ii

Given the similarity of the modus operandi underlying its allegations as to itself and its allegations as to these other companies, EnvTech has also alleged a sufficiently related RICO pattern.  The relatedness requirement calls only for "the same or similar purposes, results, participants, victims, or

methods of commission," or acts "otherwise . . . interrelated by distinguishing characteristics." *D&T Partners*, 98 F.4th at 204–05 (quoting *H.J. Inc.*, 492 U.S. at 240). Here, the allegations as to EnvTech and the other USAD competitors are virtually the same: USAD hired a competitor's key employees and, with DeBusk's knowing direction, converted those competitors' trade secrets for its own, and indirectly DeBusk's, gain.

iii

This leaves the question of whether EnvTech has alleged a sufficiently continuous RICO pattern. This issue was not addressed by the district court in its opinion, but it was presented to it in the parties' motion to dismiss papers, where, as here, EnvTech argued only open-ended continuity. Because it is connected to the relatedness issue, we exercise our discretion to reach it here. *See United States ex rel. Solomon v. Lockheed Martin Corp.*, 878 F.3d 139, 146 (5th Cir. 2017) ("[W]e can resolve the appeal on any ground that was presented to the trial court."); *Singleton v. Wulff*, 428 U.S. 106, 121 (1976) ("The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases.").

The continuity requirement is not well-defined. *See U.S. Textiles, Inc. v. Anheuser-Busch Cos., Inc.*, 911 F.2d 1261, 1267 (7th Cir. 1990) (describing continuity as "a rather amorphous concept" and "elusive issue"); *D&T Partners*, 98 F.4th at 206–07 (noting that "[w]hile other circuits have considered an explicit range of factors, we have engaged in highly fact-intensive analyses" of closed-ended continuity). Open-ended continuity "exists when a threat of continuing criminal activity extends indefinitely into the future," and requires a showing "that the predicate acts 'are a regular way of conducting defendant's ongoing legitimate business . . . or of conducting or participating in an ongoing and legitimate RICO

"enterprise."'" *D&T Partners*, 98 F.4th at 208–09 (quoting *H.J. Inc.*, 492 U.S. at 243). "Whether a plaintiff has alleged an open-ended pattern of continuity turns on whether the predicate acts themselves pose a '*threat* of continuity,'" which may be "either implicit or explicit." *Id.* at 209 (quoting *H.J. Inc.*, 492 U.S. at 241–42). We have described "an identical or analogous fact pattern" or a showing "that the entity repeats its fraud in similar business settings" as one way of satisfying the open-ended continuity requirement. *Id.*

On the one hand, EnvTech's allegations are all about a regular way of conducting ongoing legitimate business: DeBusk allegedly hired multiple competitors' former employees and directed them to use those competitors' trade secrets to benefit USDA, triggering a run of lawsuits that began in 2020 and continues today, both here regarding actions taken in 2019 and 2020 and in RTI's June 2022 suit, which focuses on actions from 2021. In this respect, DeBusk's argument that, essentially, he cannot threaten further trade secret theft because he has not been accused of doing it recently—especially in the face of multiple pending lawsuits—is unpersuasive. *See Singh*, 480 F.3d at 356 (observing, in the context of a multi-year scheme, that "[u]nlike our precedents identifying a single illegal transaction, there are multiple victims, and there is no reason to suppose that this systemic victimization . . . would not have continued indefinitely had the Plaintiffs not filed this lawsuit"). On the other hand, the rule "once a RICO violator, always a RICO violator" "would deprive the pattern requirement of all meaning by establishing open-ended continuity whenever two or more predicate acts were shown," *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1264 (D.C. Cir. 1995), and two or even four similar predicate acts do not by definition threaten repetition, *see, e.g.*, *Peel v. cPaperless, LLC*, No. 4:23-CV-02417, 2024 WL 5058609, at *16 (S.D. Tex. Nov. 8, 2024) (noting, in the

context of a single-victim scheme, that "Plaintiffs never expand on how 'other companies' may be victimized in the future").

On balance, particularly given the consistency between the modus operandi alleged with respect to the Farr Front suit and the modus operandi with respect to EnvTech itself, along with facts suggesting USAD had no intention of altering its practices, the continuity requirement is satisfied here. As in prior cases, we find this to be a fact-intensive question: here, with respect to the additional predicate act that is most specifically alleged, DeBusk allegedly hired the Farr Front employees who stole Farr Front's trade secret, then declined to subject one of them to any form of discipline when their actions resulted in what DeBusk described as an "unfavorable outcome" with respect to Farr Front's counterclaims against USAD, that is, settlement. Crediting EnvTech's allegations supporting the inference that he knew about EnvTech's trade secret, moreover, DeBusk encouraged the use of that trade secret to generate potentially millions in revenue, and continued to do so even after EnvTech's state court lawsuit against USAD and Taylor was filed. These facts, in addition to the allegations that DeBusk's actions with respect to the two other competitors were similar, support the inference that trade secret theft became USAD's regular way of doing business during the relevant period, posing a threat of future repetition that is not abated by USAD's apparently refraining from further acts.

Finally, we give some additional weight to EnvTech's argument that DeBusk's statement in his state court deposition that he "never thought about trade secrets," but instead focuses on a strategy of "execution of hiring people," supports an inference that USAD adopted a modus operandi of hiring competitors' employees to steal their trade secrets. As Shakespeare wrote, guilt sometimes "spills itself in fearing to be spilt." WILLIAM SHAKESPEARE, HAMLET act 4, sc. 5, l. 25. In more precise legal terms, the somewhat incredible statement that the CEO of a company that deals in

groundbreaking cleaning technologies never thinks about trade secrets, viewed in the light most favorable to EnvTech, could constitute a false exculpatory, making EnvTech's allegations of an illegal modus operandi more plausible. *See United States v. Meyer*, 733 F.2d 362, 363 (5th Cir. 1984) ("False exculpatory statements may be used . . . as substantive evidence tending to prove guilt.").

The RICO pattern requirements are less than crystalline, "depend[ing] on the specific facts of each case," but we hold that EnvTech's modus operandi allegations support a plausible claim that USAD engaged in an open-ended pattern of trade secret theft that threatens repetition in the future. *H.J. Inc.*, 492 U.S. at 242.

IV

EnvTech has plausibly alleged that DeBusk committed trade secret theft and conspiracy to commit the same against it, and that this was part of a modus operandi of conducting the enterprise USAD through a related and continuous pattern of RICO predicate acts. We therefore REVERSE the district court's order dismissing EnvTech's amended complaint and REMAND for further proceedings consistent with this opinion.